## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BENJAMIN RAMEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-2340 (RJL) |
| | ) | |
| POTOMAC ELECTRIC POWER | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION TO DISMISS

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure,

Defendant Potomac Electric Power Company ("Pepco") hereby moves for the entry of an Order

dismissing Plaintiff's Complaint in its entirety.  In support of its Motion, Pepco respectfully

refers the Court to the attached Memorandum.


Respectfully submitted,


_____/s/_____
Connie N. Bertram (Bar No. 435840)
Winston & Strawn LLP
1700 K St., NW
Washington, D.C. 20006
(202) 282-5000
(202) 282-5100 (fax)


Jill D. Flack (Bar No. 420020)
Associate General Counsel
Potomac Electric Power Company
701 9th Street, NW
Washington, D.C. 20068
(202) 872-2756
(202) 872-3281 (fax)


Counsel for Defendant

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BENJAMIN RAMEY,                            )
                                          )
        Plaintiff,                        )
                                          )
        v.                                )        No. 07-2340 (RJL)
                                          )
POTOMAC ELECTRIC POWER                     )
COMPANY,                                   )
                                          )
        Defendant.                        )

**DEFENDANT'S MEMORANDUM
IN SUPPORT OF ITS MOTION TO DISMISS**

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure,

Defendant Potomac Electric Power Company ("Pepco") submits its Memorandum in Support of

its Motion to Dismiss Plaintiff's Complaint.

**I.      INTRODUCTION AND SUMMARY**

In Plaintiff's current action – his ninth separate lawsuit or proceeding against Pepco –

Plaintiff brings a private action against Pepco for alleged violations of federal motor carrier laws

and regulations.  In his Complaint, Plaintiff alleges that Pepco violated federal motor carrier

testing provisions when it administered reasonable suspicion blood-alcohol testing to Plaintiff in

2003 pursuant to company policy.  Id. at ¶¶ 3, 5-11.  Plaintiff alleges that Pepco administered the

test more than eight hours after reasonable suspicion arose, used an unqualified technician for the

testing, and altered his test results.  Id.  Plaintiff seeks compensatory and punitive damages for

these purported violations.  Id. at ¶¶ 8, 10-11.

As explained in detail below, even if Plaintiff's allegations are taken as true for purposes

of this motion, Plaintiff cannot sustain a claim for relief under the federal Motor Carrier Act (the

"Act").  First, Plaintiff fails to state a claim for relief because the Act does not authorize a private

cause of action for personal damages.  <u>Second</u>, even if such a claim were somehow available to Plaintiff, the facts alleged do not establish any violation of the Act or Federal Motor Carrier Safety Regulations ("FMCSR").  <u>Third</u>, even if this Court were to afford Plaintiff every benefit as a *pro se* litigant and construe his claim as a state law tort claim, it would still fail because it would be untimely and, in any event, would be preempted by section 301 of the Labor Management Relations Act ("LMRA").

For each of these distinct reasons, Plaintiff's latest effort to subject Pepco to endless claims and litigation must fail.  Like each of the other claims pursued by Plaintiff in this Court, Plaintiff's claim should be dismissed with prejudice.

## II.     <u>ARGUMENT</u>

### A.     <u>Plaintiff Cannot Pursue A Private Suit Under The Act</u>

#### 1.     <u>The Act Does Not Authorize A Private Cause Of Action</u>

Private causes of action under the Act are only available in very limited circumstances. To maintain a private cause of action against a carrier for alleged violations of the safety provisions of the Act, a private litigant must show that:  (1) he filed an administrative complaint with DOT within 60 days of the alleged violation; (2) DOT initiated a compliance proceeding and entered an enforcement order against the carrier; and (3) the carrier failed to comply with the terms of that enforcement order.  49 U.S.C. §§ 14701-04.  As numerous courts have recognized, even where these prerequisites have been satisfied, a private litigant may not pursue a private cause of action under the Act for personal injuries.  <u>Schramm v. Foster</u>, 341 F. Supp. 2d 536, 547

(D. Md. 2004) (no private cause of action under Act for personal injuries arising out of alleged violation of safety regulations related to maximum driving hours).[1]

Because Plaintiff has not alleged and could not prove that he filed a timely complaint with DOL or that DOL entered an enforcement order against Pepco, and could not, in any event, pursue a claim for personal injuries, he cannot sustain a claim against Pepco under the Act. Consequently, his Complaint should be dismissed with prejudice.

**B.     Plaintiff Fails In Any Event To Allege That Pepco Violated The Act Or The FMCSRs**

Plaintiff could not, in any event, state a claim for relief because the Act and the FMCSRs do not govern the ***non-DOT*** alcohol test conducted by Pepco.  Thus, Plaintiff cannot allege any set of facts that would establish a claim for relief.

Contrary to the assertions in Plaintiff's Complaint, Pepco is not limited by the Act or FMCSRs to conducting alcohol testing of its drivers pursuant to the DOT testing provisions. Indeed, 49 C.F.R. § 382.111 expressly authorizes employers to conduct non-DOT drug and alcohol testing of its drivers:

**Other requirements imposed by employers.**

Except as expressly provided in this part, ***nothing in this part shall be construed to affect the authority of employers***, or the rights of drivers, with respect to the use of alcohol, or the use of controlled substances, ***including authority and rights with respect to testing and rehabilitation***.

Id. (emphasis added).  Similarly, the FMCSRs recognize elsewhere that employers may conduct non-DOT tests.  49 C.F.R. § 40.13, for example, states that "DOT tests must be completely

---

[1] See also Stewart v. Mitchell Transport, 241 F. Supp. 2d 1216, 1220-21 (D. Kan. 2002) (private litigant could not maintain personal injury suit under Act seeking damages); Renteria v. K&R Transp., Inc., 1999 WL 33268638, **4, 6 (C.D. Cal. 1999) (no private cause of action for damages arising from violation of the truth-in-leasing regulations under the Act in the absence of agency order).

separate from non-DOT tests in all respects."  Additionally, 49 C.F.R. § 40.227 addresses the forms that employers can use when conducting non-DOT tests.

Contrary to Plaintiff's assertions, Pepco did not violate these provisions in administering a reasonable suspicion blood-alcohol test to him in 2003.  Because more than eight hours had passed since reasonable suspicion had arisen when it conducted the testing, Pepco tested Plaintiff pursuant to its own testing policies, rather than the FMCSRs.  See 49 C.F.R. § 382.307.  The only requirement that the FMCSRs impose on alcohol testing in this situation is that the employer use a non-DOT test form for recording the test results.  See 49 C.F.R. § 40.227.  Because, as Plaintiff recognized in his Complaint, Pepco used a non-DOT form to conduct his testing, it did not violate the Act or FMCSRs.

Multiple tribunals have already reached this conclusion in Plaintiff's prior proceedings against Pepco.  In Plaintiff's first grievance hearing, which challenged the decision making leave ("DML") that Pepco imposed on Plaintiff as a consequence of the test results, Plaintiff made the very same allegations regarding the testing that he now asserts in this case.  The arbitrator, after reviewing Plaintiff's claims and evidence, found that:

> [T]here was nothing improper in the administration of the Breathalyzer test. . .
>
> The Company stipulated at the hearing that more than eight hours had elapsed between the time when Mr. Duarte and Mr. Johnson reached their "reasonable suspicion" conclusions and when the Grievant was given the Breathalyzer test. Because of this, a DOT alcohol test could not be administered, see § 382.307(e)(1).
>
> The Union concludes from this that this provision made it impermissible to test the Grievant for alcohol concentration. . . ..  The record does not support this reasoning.
>
> The DOT regulations specify the circumstances under which DOT alcohol testing is to be done.  ***Nothing*** that has been brought to my attention ***indicates that if the requirements for DOT testing are not met, other, non-DOT alcohol testing, is also prohibited.***

4

The regulations, § 40.227(a), recognize that an employer may administer a non-DOT test.  The only prohibition in this regard is that the DOT alcohol testing form (ATF) may not be used for a non-DOT alcohol test.  Conversely, a non-DOT form may not be used for a DOT alcohol test.

The Grievant was given a non-DOT alcohol test and Mr. Hyde used a non DOT form.  I find, therefore, that ***there was nothing illegal about conducting the Breathalyzer test as Mr. Hyde did***.

See Flack Dec., Ex. A at 8-9 (emphasis added), attached hereto as Exhibit 1.

The Honorable Judith Retchin reached the same conclusions in ruling on Pepco's motion for a preliminary injunction to prevent Plaintiff from continuing to distribute leaflets containing false and defamatory statements concerning Pepco's testing:

The next question is whether  . . . the taking of the breath sample was legal.

I understand Mr. Ramey contends that it was illegal because it was outside of DOT guidelines that say that the breath sample should be taken within eight hours after there is a reasonable suspicion to believe that the person might be under the influence.

But, as I read the regulation, that did not preclude testing, or non DOT testing.  That PEPCO is free to do its own testing if it has reason to believe, or a reasonable suspicion that an employee is impaired.  And I presume the reason for that is because they want to protect the safety of all when they are asking an employee to operate heavy equipment.  ***So I don't believe there was any illegal taking of a breath sample from Mr. Ramey.***

Transcript of August 9, 2006 Preliminary Injunction Hearing at 145-47 (emphasis added), attached hereto as Exhibit 2.  She also found based on the testimony and evidence presented at the preliminary injunction hearing that Pepco did not alter Plaintiff's test results and did not use an uncertified technician.  Id. at 145-47.[2]

---

[2] These rulings have a preclusive effect on Plaintiff's claim under the doctrine of collateral estoppel.  Collateral estoppel precludes re-litigation of a claim where that claim or a fact essential to it has already been fully litigated and decided, and preclusion would not be unfair to the party bound by the first determination.  Consolidated Edison Co. v. Bodman, 449 F.3d 1254, 1257-58 (D.C. Cir. 2006) (citing Restatement (Second) of Judgments § 27; Meng v. Schwartz,

In fact, in the many proceedings that Plaintiff has brought against Pepco, not a single tribunal has found that Pepco violated any law or upheld any of Plaintiff's allegations or claims concerning his testing.  Instead, these tribunals have repeatedly held not only that Pepco complied with all applicable laws, but also that Pepco acted in the best interests of public health and safety when it administered a non-DOT, company-sanctioned alcohol test to Plaintiff.  As this Court recognized in dismissing his first lawsuit against Pepco:

> What plaintiff appears to conveniently ignore in bringing this suit is the fact that defendants have produced evidence which demonstrates that, on the night of August 31, 2003, **_plaintiff showed up to work drunk – so drunk that when he was finally given a breathalyzer test, eleven to twelve hours after he was first confronted by his supervisor, his blood alcohol level still registered at 0.065% to 0.07%.  This is not a close call._**

Ramey v. Potomac Elec. Power Co., 468 F. Supp. 2d 51, 57 n.7 (D.D.C. 2006) (Leon, J.) ("Ramey I") (emphasis added).

Because Plaintiff fails, in his recycled and previously-rejected claim, to allege that Pepco violated the Act or FMCSRs, this case should be also be dismissed with prejudice.

**C.    Even If This Court Were To Construe Plaintiff's Claim As A State Law Tort Claim, It Still Must Fail**

**1.    Any Such Claim Would Be Untimely**

Even if the Court liberally construed his _pro se_ Complaint and interpreted it to allege a state tort claim challenging his alcohol testing by Pepco, that claim too would fail.  Any state tort cause of action that could possibly be construed from the facts alleged in the Complaint is barred by the applicable statute of limitations.  Plaintiff challenges in his most recent Complaint events

---

305 F. Supp. 2d 49, 57 (D.D.C. 2004).  Collateral estoppel applies to arbitration determinations in the same way that it applies to judicial determinations.  See Schattner v. Girard, Inc., 668 F.2d 1366, 1368 (D.C. Cir. 1981) (per curiam) ("a party whose claims have been decided in arbitration may not then bring the same claims under new labels").  Because Plaintiff fully litigated the very claims he now asserts, and because the fact-finder decided against Plaintiff on each of these issues, his claim is now barred by collateral estoppel.

that allegedly occurred during his alcohol testing by Pepco on August 30, 2003 or September 1, 2003.  See Comp., Ex. 3.  The longest statute of limitations available to Plaintiff for any tort claim challenging this testing is three years.  See D.C. Code § 12-301(8).  Because Plaintiff filed his Complaint on December 10, 2007 – well after the expiration of the three-year "catch-all" limitations period – any tort claim would be untimely and subject to dismissal.[3]

### 2.      The Claim Would Be Preempted By Section 301 Of The LMRA

In addition, as Pepco demonstrated in Ramey I, Ramey v. Potomac Elec. Power Co., Case No. 07-2132 (RJL) ("Ramey V"), and its Notice of Removal in this case, any state tort claim that Plaintiff could assert against Pepco challenging his testing would be preempted by section 301 of the LMRA.

It is well-settled that section 301 preempts state law claims that are founded upon or require the interpretation of a collective bargaining agreement ("CBA").  Sokos v. Hilton Hotels Corp., 283 F. Supp. 2d 42, 47-50 (D.D.C. 2003); Grandison v. Wackenhut Services, Inc., 2007 WL 2781892, *3 (D.D.C. 2007); see also Pepco's Memorandum In Support of Its Motion to Dismiss in Ramey V, attached hereto as Exhibit 3.  Because the resolution of any tort claims challenging his testing would require the Court to apply and interpret numerous provisions of the CBA and the testing policies adopted pursuant to it, they would be preempted by section 301. See Ex. 3 at 5-11.  If the Court elected to convert such claims into section 301 breach of contract claims, they would be subject to dismissal because Plaintiff filed this action well after the

---

[3] It is difficult to imagine what tort claim Plaintiff could assert against Pepco that he has not already asserted.  In his various lawsuits and counterclaims against Pepco and others challenging his testing, discipline and termination, Plaintiff has asserted claims for negligent hiring, negligent and intentional infliction of emotional distress, assault, battery, false imprisonment, and wrongful termination.  With the exception of the wrongful termination claim pending before the Court in Case No. 07-2132 (RJL) (filed Nov. 7, 2007), each of these claims has been dismissed with prejudice.

expiration of the six-month limitations period for section 301 claims.  Del Costello v.

International Bhd. of Teamsters, 462 U.S. 151, 169 (1983); Cephas v. MVM, Inc., 403 F. Supp.

2d 17, 23-24 (D.D.C. 2005); Ex. 3 at 10-11.

Thus, Plaintiff could not state a claim for relief under any plausible construction of his

Complaint.

**III.     CONCLUSION**

For the foregoing reasons, Pepco respectfully requests that this Court dismiss Plaintiff's

Complaint with prejudice.

Respectfully submitted,

_____/s/_____
Connie N. Bertram (Bar No. 435840)
Winston & Strawn LLP
1700 K St., NW
Washington, D.C. 20006
(202) 282-5000
(202) 282-5100 (fax)

Jill D. Flack (Bar No. 420020)
Associate General Counsel
Potomac Electric Power Company
701 9th Street, NW
Washington, D.C. 20068
(202) 872-2756
(202) 872-3281 (fax)

Counsel for Defendant

January 8, 2008

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 8th day of January 2008, I caused a true and correct copy of

the foregoing Reply in Support of Its Motion to Dismiss to be served by first class mail, postage

prepaid, on the following:

> Benjamin Ramey
> 4251 Clay Street, NE
> Washington, DC 20019

_____/s/_____

Connie N. Bertram

9

Case No. 1:07-cv-2340 (RJL)

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BENJAMIN RAMEY,     )
            )
    Plaintiff,   )
            )
v.           )  Case No. 1:04CV02088 (RJL)
            )
POTOMAC ELECTRIC POWER  )
COMPANY, et al.,     )
            )
    Defendants.  )

## DECLARATION OF JILL FLACK

I, Jill Flack, do hereby depose and swear as follows:

1. I am over the age of eighteen (18) and am otherwise competent to make this Declaration. The information contained in this Declaration is based on my personal knowledge.

2. I am currently employed by Potomac Electric Power Company ("Pepco") as an Associate General Counsel.

3. I appeared as counsel for Pepco in arbitration number 16 300 00643 04 between Pepco and Plaintiff's union, the International Brotherhood of Electrical Workers, Local 1900 ("Local 1900").

4. On December 14, 2004, arbitrator Charles Feignebaun rendered a decision in that arbitration. A true and accurate copy of the decision is attached as Exhibit A.

5. I also appeared as counsel for Pepco in arbitration number 16 300 E 00137 05 between Pepco and Local 1900.

::ODMA\PCDOCS\DC1DOCS1\200544\1

6.    On July 18, 2005, arbitrator Jerome H. Ross rendered a decision in that arbitration. A true and accurate copy of the decision is attached as Exhibit B.

7.    I have enclosed as Exhibit C true and correct copies of certifications provided to me by Thomas Hyde, a contractor retained by Pepco to perform alcohol testing.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me is willingly false, I am subject to punishment.

_____/s_____
Jill Flack

::ODMA\PCDOCS\DC1DOCS1\200544\1

# EXHIBIT A

```
┌─────────────────────────────────────┐
│ POTOMAC ELECTRIC POWER               │
│ COMPANY                              │
│                                      │
│ and                                  │
│                                      │
│ INTERNATIONAL BROTHERHOOD            │
│ OF ELECTRICAL WORKERS,               │
│ LOCAL 1900                           │
└─────────────────────────────────────┘
```

AAA No. 16 300 00643 04

President's Grievance
Benjamin F. Ramey

**Appearances**

For the Company

Jill D. Flack, Esq.
David A. Duarte

For the Union

Joseph E. Hawkins
John A. Coleman
Benjamin F. Ramey, Grievant

Arbitrator

Charles Feigenbaum

The parties to this dispute are the Potomac Electric Power Company [Company], and the International Brotherhood of Electrical Workers, Local 1900 [Union]. The Arbitrator was selected under the procedures contained in the parties' collective bargaining agreement. The hearing was held in Washington, D.C., on December 10, 2004.

Both parties were represented and had full opportunity to examine and cross-examine witnesses, to offer evidence, and to set forth their positions. All witnesses were sworn. Both parties made oral closing argument at the hearing. Based on the evidence, the positions argued by the parties, and the observation of witnesses while testifying, I make the following findings and Award.

## ISSUE

The parties stipulated the issue as:

Did the Company have just cause to issue the Grievant Decision Mak-

ing Leave? If not, what shall be the remedy?

## RELEVANT GOVERNMENT REGULATIONS AND COMPANY RULES

### I.  U.S. DEPARTMENT OF TRANSPORTATION FEDERAL MOTOR CARRIER SAFETY REGULATIONS

**§40.225  What form is used for an alcohol test?**

(a) The DOT Alcohol Testing Form (ATF) must be used for every DOT alcohol test beginning February 1, 2002. . . .

**§40.227  May employers use the ATF for non-DOT tests, or non-DOT forms for DOT tests?**

(a) No, as an employer, BAT, or STT,[1] you are prohibited from using the ATF for non-DOT alcohol tests. You are also prohibited from using non-DOT forms for DOT alcohol tests. Doing either subjects you to enforcement action under DOT agency regulations.

**§382.307  Reasonable suspicion testing**

(a) An employer shall require a driver to submit to an alcohol test when the employer has reasonable suspicion to believe that the driver has violated the prohibitions of subpart B of this part concerning alcohol. The employer's determination that reasonable suspicion exists to require the driver to undergo an alcohol test must be based on specific, contemporaneous, articulable observations concerning the appearance, behavior, speech or body odors of the driver.

(c) The required observations for alcohol and/or controlled substances reasonable suspicion testing shall be made by a supervisor or company official who is trained in accordance with §382.603. The person who makes the determination that reasonable suspicion exists to conduct an alcohol test shall not conduct the alcohol test of the driver.

(d)  Alcohol testing is authorized by this section only if the observations required by paragraph (a) of this section are made during, just preceding, or just after the period of the work day that the driver is required to be in compliance with this part. A driver may be directed by the employer to only undergo reasonable suspicion testing while the driver is performing safety-sensitive functions, just before the driver is to perform safety-sensitive functions, or just after the driver has

---

[1] BAT (Breath Alcohol Technician), STT (Screening Test Technician).

ceased performing such functions.

(e)(1) . . . If an alcohol test required by this section is not administered within eight hours following the determination under paragraph (a) of this section, the employer shall cease attempts to administer an alcohol test and shall state in the record the reasons for not administering the test.

## II.   HUMAN RESOURCES -- CORPORATE PERSONNEL POLICIES -- NO. 80.200  DRUG AND ALCOHOL

### Alcohol Standards

### Fitness For Duty/Alcohol in System

Employees must report to work and while on duty or on Company property must remain in a condition to perform their duties safely and with maximum efficiency.

> An employee in any job classification may not have a blood-alcohol concentration of 0.05% or more (or have a concentration equal to, or in excess of, a corresponding level as determined by a different diagnostic test such as a Breathalyzer) while on duty or on Company property. An employee found to have a to have a blood-alcohol concentration of less than 0.05% (or its equivalent) shall be considered in violation of this standard where it can be determined based on accepted medical ranges that the employee had a concentration of 0.05% or more (or its equivalent) while on duty or on Company property. In either of these circumstances, the employee shall be placed on Decision-Making Leave (DML).

### Other Rules

### Testing

Employees will be required to submit to blood, urine, breathalyzer or other diagnostic tests to detect alcohol and/or drugs (or drug metabolites) in their system under any of the following circumstances:

> When there is a triggering event or a reason to believe drugs or alcohol may have been used;

- When such testing is required under local or federal legislation, regulation or administrative rule;

## BACKGROUND

The Grievant, Benjamin F. Ramey, is employed by the Company as a Conduit Installer A. His work requires him to drive commercial vehicles and he has a Commercial Driver's License (CDL). He is covered by the U.S. Department of Transportation (DOT) Federal Motor Carrier Safety Regulations.

He worked the midnight to noon shift on August 30, 2003. His supervisor was Gregory M. Johnson. Shortly after the Grievant reported for work at the Benning Service Center, he asked Mr. Johnson if he could go off-site and buy cigarettes; Mr. Johnson permitted him to do so. Mr. Johnson testified that he saw nothing unusual about the Grievant at this time.

At or about 2 a.m., Mr. Johnson needed the Grievant to operate a 26,000 pound dump truck. Mr. Johnson asked some of the Grievant's fellow employees to find him and have him report to Mr. Johnson so he could give him the assignment. They could not locate him at first and Mr. Johnson told them to look for him in the parking lot. After a little while, first one employee, and then a second, told Mr. Johnson that the Grievant was in no condition to drive. One of them described him as being "out of it."

The Grievant came into Mr. Johnson's office some 15 minutes later. Mr. Johnson said he smelled of alcohol, his speech was slurred and incoherent, he was unsteady on his feet and his eyes were very bloodshot.

Mr. Johnson concluded that the Grievant was under the influence of alcohol. He called his general manager for instructions and also spoke to other Company officials. Eventually, he spoke with Senior Business Partner David A. Duarte, who told him to bring the Grievant with him and report to Company headquarters at Edison Place. When they arrived, Mr. Duarte and Union steward Loman Dudley were there. They were joined by Human Resources Business Partner Negussie B. Birratu at about 5 to 5:30 a.m. Both Mr. Duarte and Mr. Birratu have Labor Relations responsibilities.

Mr. Duarte stated that it was about 3:30 to 4 a.m. when the Grievant and Mr. Johnson arrived at Edison Place. He spoke with the Grievant at this time and said there was a very strong odor of alcohol about him. He had trouble maintaining his balance, his speech was slurred and his eyes "were very, very bloodshot." He asked the Grievant if he had been drinking and said that the Grievant told him that he had had "a couple of beers" before coming to work. Mr. Johnson corroborated that the Grievant made this statement. Mr. Duarte decided that there were grounds for reasonable suspicion that the Grievant had been drinking and that testing was appropriate.

Mr. Birratu testified that he considered the Grievant to be under the influence of alcohol based on his observation of his unsteady gait, slurred speech and very bloodshot eyes. He, Mr. Duarte and Mr. Johnson, all testified that they had been trained in alcohol and controlled substance use as specified in DOT regulation §382.603.

Mr. Duarte attempted to contact the Company's on-duty tester so that the Grievant could be tested. There was no response. He tried some three or four times without success. He called a Benefits Department supervisor and said there was need to make some alternative arrangement for testing. She told him she would make calls and get back to him, which she did about an hour later. She gave him a location in Northern Virginia where she said the testing could be conducted. Mr. Duarte then arranged for Mr. Birratu, Mr. Johnson, Mr. Dudley and the Grievant to drive from Edison Place to that location. By this time it was about 6 a.m.

The trip was one misadventure after another. First, the men got lost. Then, when they arrived, it was at the wrong location. They had gone to Inova Hospital; it did not administer tests. They were told they should have gone to its clinic, a satellite facility. There were administrative problems at the clinic and no testing was done there. All of this took some hours, during which time they kept in telephone contact with Mr. Duarte. It was decided that they

would all meet at Edison Place and the men drove back there.

When it was evident that the trip to Northern Virginia had been unsuccessful, the benefits supervisor attempted to arrange for someone to come to Edison Place to test the Grievant there. She was able to get Thomas Hyde, a self-employed certified Drug Screen Collector and Breath Alcohol Technician. He arrived at Edison Place at about 10 a.m. It took some time before he was ready to administer the tests. There was a problem with getting the correct forms and he did not begin testing until after 11 a.m.

The Company's original intention had been to have the Grievant tested under the DOT rules. However, it was now more than eight hours since Mr. Johnson and Mr. Duarte had reached their "reasonable suspicion" conclusions. Mr. Hyde stated, as the others were already aware, that it was now too late for application of DOT testing. Based on Corporate Personnel Policy No. 80.200, Mr. Duarte told Mr. Hyde to give the Grievant non-DOT tests.[2]

Mr. Hyde tested the Grievant twice. The first Breathalyzer result was 0.070%. This was at 11:09 a.m. He did a confirmatory test at 11:32 a.m., with a score of 0.065%. The Grievant was issued Decision-Making Leave (DML) based on the 0.065% Breathalyzer result. DML is the disciplinary step one level below termination. It is required by Policy No. 80.200 when an employee has a concentration of 0.050% or more while on duty or Company property.

At the hearing, the Grievant vigorously denied that he had been drinking before coming to work or that he had said anything about having a couple of beers. He also stated he had not had anything to drink while on his shift. Mr. Dudley testified that he did not see signs of alcohol impairment and said that a doctor at the clinic had told him that the Grievant didn't look drunk to him.

Both the Grievant and Mr. Dudley said that the Grievant had not been al-

---

[2] Mr. Hyde tested the Grievant for both drugs (urine test) and alcohol (Breathalyzer). However, because the discipline given him was based solely on the results of the Breathalyzer test there is no need for further mention of the drug test.

AAA 16 300 00543  04 (Benjamin Ramey)
Page 7 of 10

lowed to go to the bathroom while at Edison Place before going to Virginia.
Mr. Dudley said he was allowed to go at the second location only after Mr.
Dudley protested when Mr. Birratu refused the Grievant's request. The
Grievant said he was never *allowed* to go. He took it upon himself to do so in
Virginia when he felt he could no longer hold himself in. He also said Mr.
Duarte had shouted "Shut up" at him when he made a second request at Edi-
son Place.

Mr. Duarte denied having told the Grievant to shut up, but agreed that he
had not allowed him to visit the bathroom at Edison Place when he first re-
quested to do so. That was when he was still hoping that they could reach the
on-duty tester and have DOT tests performed. He reasoned that allowing the
Grievant to relieve himself at the time might result in a lengthy wait for him
to provide another urine sample when the tester arrived. He said, however,
that once it was apparent that the tester was not coming, the Grievant was
permitted to go to the bathroom. Mr. Birratu stated that the Grievant had
gone to the bathroom twice; once at Edison Place and then at the second Vir-
ginia location.

Mr. Dudley testified that Mr. Hyde told the group that he did not have the
correct forms and it would be illegal to administer the test under the circum-
stances. Then, after Mr. Hyde and Mr. Duarte met separately, Mr. Hyde pro-
ceeded to conduct the test. When Mr. Dudley questioned him about this, Mr.
Hyde reiterated that this was illegal, but said he was going to do it anyway.
The Grievant testified that after Mr. Hyde stated there was a problem, Mr.
Duarte motioned for him to follow him and they went into a separate room
and closed the door. They came out after about five minutes and he was told
to take the Breathalyzer test.

Both Mr. Duarte and Mr. Hyde denied any separate meeting. Mr. Hyde also
denied having said that testing would be illegal. He testified that the testing
had been legally performed. He stated that the DOT regulations recognize

that non-DOT testing can be done so long as non-DOT forms are used.

## DISCUSSION AND FINDINGS

There are two key questions here. The first is, was the testing of the Grievant improper, making the results of the Breathalyzer null and void? In the event that the testing was not improper, the second question is, was he in violation of Corporate Personnel Policy No. 80.200? The answers to these questions are "No" and "Yes." That is, there was nothing improper in the administration of the Breathalyzer test, and the Grievant was in violation of Corporate Personnel Policy No. 80.200. For that reason, there was just cause for the DML.

The Company stipulated at the hearing that more than eight hours had elapsed between the time when Mr. Duarte and Mr. Johnson reached their "reasonable suspicion" conclusions and when the Grievant was given the Breathalyzer test. Because of this, a DOT alcohol test could not be administered, see §382.307(e)(1).

The Union concludes from this that this provision made it impermissible to test the Grievant for alcohol concentration. Period. It argues that once the eight hours had passed, he should not have been tested and the test result is null and void. The record does not support this reasoning.

The DOT regulations specify the circumstances under which DOT alcohol testing is to be done. Nothing that has been brought to my attention indicates that if the requirements for DOT testing are not met, other, non-DOT alcohol testing, is also prohibited.

It is true that the last sentence of §382.307(e)(1) states:

> If an alcohol test required by this section is not administered within eight hours following the determination under paragraph (a) of this section, the employer shall cease attempts to administer an alcohol test and shall state in the record the reasons for not administering the test.

However, the context makes it plain that the mandate to employers to cease

attempts to administer an alcohol test after eight hours applies *to a DOT alcohol test*. The regulations, §40.227(a), recognize that an employer may administer a non-DOT test. The only prohibition in this regard is that the DOT alcohol testing form (ATF) may not be used for a non-DOT alcohol test. Conversely, a non-DOT form may not be used for a DOT alcohol test.

The Grievant was given a non-DOT alcohol test and Mr. Hyde used a non-DOT form. I find, therefore, that there was nothing illegal about conducting the Breathalyzer test as Mr. Hyde did and I credit his testimony that he never said that it was.

Corporate Personnel Policy No. 80.200 furnishes authority, separate from the DOT regulations, for conducting "reasonable suspicion" alcohol tests. It does not contain time limits.

There was a valid basis for the Company to require the Grievant to undergo "reasonable suspicion" alcohol testing under this policy. Mr. Duarte, Mr. Johnson and Mr. Birratu all testified credibly that they observed that the Grievant's speech was slurred, his eyes were very bloodshot and he was unsteady on his feet. These were observations any layman could make. In addition, all three had received training under §382.603.

Mr. Hyde testified credibly about the manner in which he administered the test and the calibrations he made. I find that the test was accurate and that, at 11:32 a.m. on August 30, 2003, the Grievant had an alcohol concentration of 0.065%. That being the case, the discipline of DML was required under Policy No. 80.200.

Finally, there is disputed testimony about whether Mr. Duarte shouted "Shut up" at the Grievant and the degree to which the Company barred him from going to the bathroom to relieve himself. I make no finding about these matters because, even if the testimonies of the Grievant and Mr. Dudley on these points are fully credited, the Company's alleged actions would not warrant

AAA 16 300 00643 04 (Benjamin Ramsey)
Page 10 of 10

overturning the DML in these circumstances. The overwhelming evidence in this case is that the Grievant was under the influence of alcohol while on duty and on Company property.

## AWARD

This grievance is denied.

Charles Feigenbaum

December 14, 2004
Date

# EXHIBIT B



In the Matter of the Arbitration )

     Between )

POTOMAC ELECTRIC POWER )
COMPANY )

     and )

LOCAL UNION NO. 1900, )
INTERNATIONAL BROTHERHOOD )
OF ELECTRICAL WORKERS )

AAA No. 16 300 E 00137 05
Grievant: Benjamin F. Ramey
Issue: Termination

Before:                  Jerome H. Ross, Arbitrator

Date of Hearing:        July 11, 2005

Appearances

     For the Company:       Jill D. Flack, Esq.

     For the Union:         Joseph E. Hawkins

## Statement of the Case

In this grievance, dated November 4, 2004, the Union protests the termination of Benjamin F. Ramey, a Conduit Installer A, with a seniority date of October 7, 1991. As a remedy, the Union requests that the grievant be reinstated and made whole for all lost wages and benefits.

In the early morning hours of August 30, 2003, the grievant's supervisor on the midnight shift informed Dave Duarte, a Sr. Business Partner in human resources, that the grievant appeared under the influence of alcohol or drugs. Duarte determined to have the grievant tested for drugs and alcohol under the U.S. Department of Transportation (DOT)

2

regulations. The grievant's job duties involve the operation of commercial motor vehicles in excess of 26,000 pounds, and he is required to hold a commercial drivers licence (CDL). Due to the holiday weekend and a storm, difficulties were encountered in arranging for the tests. When the tests were finally administered, the grievant tested positive with a blood-alcohol concentration (BAC) of 0.065. The Company's Drug and Alcohol Policy states:

"An employee in any job classification may not have a blood-alcohol concentration of 0.05% or more...while on duty or on Company property. In...these circumstances the employee shall be placed on Decision-Making Leave (DML).

On September 10, 2003, after retesting negative and determined to be drug-free, the grievant was returned to work with no driving duties. An appointment was made for him to discuss entry into a rehabilitation program with the Corporate Nurse, Stacy Saucier.

On September 15, 2003, the grievant met with Russ Wade, a licensed psychiatric social worker, who serves as a substance abuse professional for the Company and other companies in the Washington, D.C. metropolitan area. Wade is referred through a managed care company, Value Options, which provides employee assistance program services to employers. Wade's role is to meet with an individual to assess and match up the person with an appropriate treatment or educational facility. After two-to-four weeks in a treatment or educational program, Wade again sees the person to ensure that he or she is "doing what they are supposed to do." He sees the person a third time after the program has ended to ensure satisfactory completion of its requirements. During the course of the program, Value Options is in touch with the program provider and alerts Wade if a person does not complete the program.

3

By letter dated September 15, 2003, Wade informed Saucier that he had evaluated the grievant in accordance with the DOT Substance Abuse Guidelines after the grievant's violation of DOT rules with a positive substance abuse screen on August 30, 2003. Wade recommended enrollment at the Kolmac Clinic in an intensive outpatient alcoholism treatment program.[1]

In a memorandum dated September 30, 2003, and titled Decision-Making Leave, Bill Sigafoose, then the Division Manager for Underground Maintenance and Construction, confirmed for the grievant the events that led up to placement on the DML on September 10, 2003.[2] The memorandum further states:

...While you are on DML, the final level of Positive Discipline, it is necessary for you to maintain your total job performance at a fully acceptable level in every area, since any further problem in the next eighteen (18) months in any performance category (work performance, conduct and safety, or attendance) that require disciplinary action, will result in your discharge.

You are also being placed on drug and alcohol probation for a period of three (3) years and shall be subjected to random drug and alcohol testing during the first two (2) years of the probation period. This testing is in addition to the CMV Drug Testing of Policy 10.00. If you fail to meet any of the provisions set forth during the probationary period, you will be discharged.

You must meet and consult with the Corporate Nurse as to an appropriate rehabilitation program. You must make a good faith and successful effort to complete any recommended rehabilitation program, including counseling. If you fail to attend, participate in or complete rehabilitation activities which are required by the health care professionals to whom you are referred, you shall be discharged.

---

[1] DOT regulations and Company policy require enrollment in a rehabilitation program before an employee who has violated DOT rules is allowed to drive a commercial motor vehicle.

[2] An arbitration award, dated December 14, 2003, denied the Union's grievance protesting the issuance of the DML in connection with the incident on August 30, 2003.

4

Although the grievant continued to report to work and perform duties that did not involve the operation of commercial motor vehicles, he did not contact Kolmac. After Duarte and Saucier learned that the grievant had not enrolled in the program, Saucier sent the grievant a memorandum, dated October 8, 2003, stating:

> In response to recent information regarding your recommended treatment program, Pepco has been informed that you have refused to schedule and [sic] appointment at the KOLMAC.
> At this time, you are required to schedule and [sic] appointment with the KOLMAC program that has been recommended to you by Mr. Russ Wade. Once you have scheduled an appointment, you are to call me to give me the date and time of the appointment.
> Once you have attended the first appointment you are also required to call to notify me that you have attended the appointment and provide the dates of subsequent schedule of sessions in the KOLMAC program....
> Upon receipt of this requested information, I will notify the Compliance department and they will be in contact with you regarding return to work.

On October 13, 2003, the grievant tested negative on a urine drug screen, as reported on October 16, 2003, in connection with entry into the Kolmac program. Kolmac's intake sheet for the grievant, which appears to have been completed by a Kolmac interviewer, states under "Reason for seeking treatment at this time": "Pt took breathalyzer 12 hours after admitting to employer that he had been drinking....Referred here by employer (PEPCO)." The sheet further states under "Problems and stresses including work": "Work Went to work drunk – EAP Stacey Saucier – Cannot return to work until completes Program. Denies all other stressors. Denies he is alcoholic." The grievant's Kolmac medical file notes indicate that he began taking antabuse in conjuction with his treatment.

While continuing to work and perform non-DOT related duties, the grievant attended all scheduled evening sessions at Kolmac during the two-week of period October 13-27, 2003 (excluding Saturday and Sunday), after which he was discharged

5

from the program. The Session Notes, which are completed by the Kolmac counselor at
each session, indicate that the grievant reported having been abstinent on all dates except
before the October 20 and 27 sessions. The counselors' narrative notes for each session,
which are not totally legible, state:

> October 13 – introduced [illegible] himself to the group
> October 14 – not clear of necessity of [illegible]
> October 15 – doesn't see himself as a recovering alcoholic[.] Hopes to
> take advantage of the treatment.
> October 16 – hasn't admitted his alcoholism yet, probably [because]
> hasn't had typical withdrawal symptoms – any [illegible] these sessions
> interfere with his routine
> October 20 – relapsed over weekend; doesn't see himself as "alcoholic"
> October 21 – different outlook than before – more energized with
> abstinence & likes the feeling – has some alcohol in the house but doesn't
> bother him [-] usually drank on weekends – so far so good
> October 22 – admits he is a "recovering alcoholic" – last weekend didn't
> drink & it was OK
> October 23 – doing alright. Evenings are full around home
> October 27 – drank on feelings of reacting to others.

On October 28, 2003, at about 1:00 a.m., the grievant went to the emergency
room at Howard University Hospital, where he was diagnosed with high blood pressure
and referred to his personal physician who, it appears, in turn referred him to a
psychiatrist. The grievant called in to report off work and was on sick pay until the end
of April 2004, after which he filed for workers compensation.

By letter dated November 10, 2003, Wade informed Saucier that the grievant was
discharged from the Kolmac treatment program as of October 27, 2003. The letter
further states that "Rhonda of Value Options in Texas" told Wade that she had received
the copy of the termination letter, and the grievant was terminated for having a positive
breathalizer reading while in attendance.

6

On March 4, 2004, the grievant was examined by Dr. Schulman, an occupational psychiatrist, after referral by Colonial Health, the Company's health care administrator, for an independent medical evaluation. Dr. Schulman's 11-page report, dated March 12, 2004, concludes with the following recommendations:

> A. Mr. Ramey is close to, but not quite yet at. [sic] maximum medical improvement (MMI). I recommend that he remain compliant with the treating psychiatrist's medical recommendations.
> B. In all medical likelihood, Mr. Ramey should recover without a residual impairment. I advise that he consult again with his treating psychiatrist, follow the doctor's recommendations for treatment, and then be released to return to work effective within the next two weeks.
> C. Finally, Mr. Ramey has had a long history of addiction. His recent violation of the company's drug and alcohol policy indicates that Mr. Ramey does require alcohol rehabilitation treatment as a condition of his return to work. I recommend he resume appropriate treatment.

By memorandum dated July 16, 2004, Sigafoose directed the grievant to report to a Continued Employment Meeting on July 22, 2004. The memorandum states:

> On September 30, 2003, you were issued a Decision Making Leave (DML) for violating the Company's Drug and Alcohol Policy. At that time you were informed that you must enter into and successfully complete an approved rehabilitation program. You were also informed that failure to do so would result in your termination from the Company. This requirement was further documented in my memorandum to you of September 30.
> On November 10, 2003, the Company was notified that you had been discharged from the approved rehabilitation program that you had entered. You were terminated from the program for having a positive Breathalizer reading while in attendance. This was a program violation.
> As a result of the above incident, you have not fulfilled your obligation to successfully complete an approved rehabilitation program as required by your DML agreement, consequently, it appears discharge is warranted.

At the Continued Employment Meeting on July 22, 2004, John Coleman, the Union President, produced the document dated October 16, 2003, which reflects the grievant's negative test results for drugs. Duarte pointed out that the test was not for

alcohol. Coleman replied that it was the only test administered to the grievant while he was in the Kolmac program. The meeting was adjourned pending further investigation regarding the grievant's testing and documented results while in the program.

Duarte called Value Options and learned that people in rehab programs are tested frequently by breathalizer for alcohol, but the test results are not disclosed to employers or outsiders, because participants occasionally "fall off the wagon" and records are not kept. Value Options sent Duarte a copy of the grievant's Kolmac Clinic Discharge Summary, dated November 6, 2003, which states:

> Significant Findings: The patient had a 12 year history of pathological use of alcohol. Manifestations of this included:
> *Reduced internal control over use
> *Abnormally high tolerance
> *Continued use despite adverse consequences (continued drinking despite job suspension)
> Course of Treatment:
>   Detoxification and Medication: Detoxification was not required. Antabuse was administered on a daily basis. No other medications were prescribed.
>   Rehabilitation Phase: Attempts to stabilize the patient were unsuccessful because of repeated relapses.
>   Continuing Care Phase: The patient did not enter this phase of the treatment program.
> Discharge Description: Did Not Complete Rehabilitation: Staff Initiated. The patient continued to deny an alcohol problem, did not feel that he needed treatment, and continued drinking alcohol.

By memorandum of November 8, 2004, Sigafoose informed the grievant that his employment was terminated. The memorandum states in part:

> Subsequent to the [Continued Employment] meeting the Company contacted Kolmac Clinic regarding your performance in the rehabilitation program. The clinic stated that you did not complete the Rehabilitation Phase due to repeated relapses. Consequently, you did not enter the Continuing Care Phase of the program. Further, they indicated that you continued to deny an alcohol problem, that you did not feel you needed treatment, and that you continued to drink alcohol. Consequently, it was

8

determined that you could not be successfully treated under the program at that time and your participation was terminated.

As you are aware, one of the conditions of the DML that was issued to you on September 30, 2003, is that you must enter into and successfully complete an approved rehabilitation program for drugs and alcohol. Additionally, failure to do so would result in your termination from the Company. As indicated above, you did not complete the program at Kolmac Clinic. Consequently, you have failed to meet your obligation to the Company as agreed to as a part of the DML.

On January 6, 2005, a Step Two meeting was held to discuss the instant grievance. Coleman produced a letter, dated July 27, 2004, from Kolmac Clinic to an investigator in the D.C. Defender Services Office, stating that the grievant "was given a random urinalysis on October 13, 2003. The results were negative." During the meeting, Coleman emphasized that the letter does not indicate the grievant's failure to pass a breathalizer test, as asserted in several other documents.

## Issue

Whether the grievant was discharged for just cause; and if not, what is the appropriate remedy?

## Company Position

The Company asserts that the grievant's testimony was incredible with regard to drinking one beer prior to reporting to work on August 30, especially because he tested positive at a BAC of 0.065 and admitted to heavier drinking in interviews with Kolmac, Dr. Schulman and Duarte. It further maintains that the grievant refused to enroll in the Kolmac Clinic, and he never contacted Wade. In this regard, it points out, the choice of a rehab program was Wade's, not the grievant's. The Company submits that the Union's

reliance on the grievant's October 13 urinalysis test results for entry into the Kolmac program means little, given that he did not successfully complete the program. Further, it contends, the grievant's testimony that he never admitted to being an alcoholic and did not drink while in the program is contrary to the Kolmac records, Wade's understanding and Dr. Schulman's report. The Company emphasizes that the grievant understood the DML terms concerning successful completion of the program to avoid termination of employment. Moreover, it notes, his job duties required a CDL in the operation of commercial motor vehicles. It points out that although initially there was confusion concerning the reasons for the grievant's discharge from the program, the Discharge Summary, which management later received, establishes the reason as his noncompliance with the program's requirements. The Company points to the grievant's contradictory testimony that he had determined to leave the program anyway when Kolmac coincidently had issued the termination action, yet he would have completed the program. It says that management gave the grievant numerous chances to enter and successfully complete a program. The Company observes that, notwithstanding the DML's clear admonition that further infractions within the next 18 months would result in termination, he violated the requirement to attend and successfully complete the Kolmac treatment program.

### Union Position

The Union contends that the grievant was attempting to complete his rehabilitation prior to his termination on October 27. It labels as coincidental his hospital visit on October 28, after which, it notes, he remained on sick pay under a doctor's care

through April 2004. Moreover, it says, Dr. Schulman released him to return to work. The Union emphasizes that Wade's letter to Saucier and the notice of Continued Employment Meeting dated July 16, 2004, are totally wrong in citing a positive breathalizer test as the reason for the grievant's discharge from the Kolmac program. The Union observes that management waited nine months after the grievant's discharge from the program to issue the Continued Employment Meeting letter, and then management waited another four months after that meeting to issue the termination letter -- totaling more than one year from the grievant's discharge from the program. During that period, it submits, Duarte learned of the information in Kolmac's letter to the D.C. Defender Services Office, stating that the grievant had no positive tests while in the program. The Union maintains that the Session Notes are contrary to the reasons for discharge that are given in the Discharge Summary and the Company's termination memorandum, because the notes reflect only one relapse, midway through his participation, and contain several positive comments concerning his progress. Additionally, it observes, a Kolmac counselor initially determined that his history was not so serious as to require detoxification. It rhetorically questions how the grievant could have relapsed in light of his testimony that he had stopped drinking prior to entering the program and absent a positive alcohol or drug test. For these reasons, the Union argues, the grievant was erroneously terminated from the program and never given an opportunity to complete rehabilitation. It concludes that had management fully investigated the matter and found these inconsistencies, the termination memorandum would not have been issued.

11

<u>Discussion and Findings</u>

I find the grievant's testimony to have been inconsistent and generally incredible in the face of strong contradictory evidence. The grievant testified to having had "maybe a beer" at about 6:00 p.m. before reporting to work at 11:00 p.m., yet he tested positive with a BAC level of 0.065 on the morning of August 30, 2003, and Wade testified that he reported drinking after 7:00 p.m., and Dr. Schulman's report states: "Mr. Ramey acknowledged that he had been drinking prior to coming to work, in violation of company policy." The grievant testified that he waited several weeks for Wade to receive documents from the Company after the meeting on September 15, 2003, yet Wade testified that he expected the grievant to contact Kolmac after the meeting. The grievant testified that he drank one beer one time while in the Kolmac program before the October 20 session, yet the Session Notes for October 20 and 27 respectively state, obviously based on his self-reporting, that he "relapsed over weekend" and "drank on feelings of reacting to others." The grievant testified that he denied being a "recovering alcoholic" and said he was an "assumed alcoholic" in the Kolmac sessions, yet the Session Notes for October 21 – 23 reflect otherwise. The grievant's testimony that he refused management's offers to return to work after discharge from Kolmac because he didn't need the treatment program is supported by Dr. Schulman's report,[3] yet he testified that on October 27 his intent was to complete the rehab program.

---

[3] Dr. Schulman's report states, under a section titled "History of his Subsequent Alcohol Rehabilitation Treatment":

On October 20, 2003, Mr. Ramey began treatment at the Kolmac Clinic. Meanwhile, he was continuing to work during the day. He attended the program from 5:30 p.m. to 8:30 p.m. Although he felt that he did not have a problem with alcohol, he initially agreed to attend the program.

It was Mr. Ramey's contention, however, that he had to "get out of the program." On October 24, 2003, he advised program personnel that he had had a beer,

12

I further find that the assertions of the grievant and the Union mischaracterize the information contained in Kolmac's letter of July 27, 2004, to the D.C. Defender Services investigator. The letter states that "Mr. Ramey was given a random urinalysis on October 13, 2003." It does not address the frequency of breathalizer tests or other tests for alcohol. Accordingly, there is no basis for the assertion made in the Continued Employment Meeting held on July 22, 2004, five days before the date on the Kolmac letter, that the grievant had tested negative on all tests administered to him at Kolmac. In this regard, based on the inconsistencies and contradictions with other evidence in the grievant's testimony concerning other factual questions, I have not credited his testimony that he took one breathalizer test early in the program. Indeed, the grievant's inconsistent testimony reaches to this question, given his acknowledgement that in the Step Two meeting he "might have said" he'd taken a breathalizer test at every session. Finally, I find no evidentiary basis for the Union's assertion that Duarte knew the contents of the July 27 letter prior to the termination memorandum of November 8, 2004. In this regard, I find credible Duarte's hearsay testimony, based on a Value Options representative's statements to him during his inquiry following the Continued Employment Meeting on July 22, 2004, that in the interest of patient rehabilitation, the test results for group session participants are not disclosed or retained.

I also find of little moment the facts that Wade's letter and the notice of the Continued Employment Meeting wrongly cite a positive breathalizer test as the reason for

---

although when he began the program, he had been placed on Antabuse, a drug that interferes with the metabolism of alcohol, producing a rather adverse physiological response to drinking.

When Mr. Ramey returned to the program, on October 27, 2003, he was discharged because of noncompliance. It was his contention that drug addicts were allowed to continue in the program after they had experienced relapses. He felt that his dismissal was discriminatory.

13

the grievant's discharge from the treatment program. The Company's termination action ultimately was based upon the reasons contained in the Summary Discharge, dated November 6, 2003, and received by Duarte after July 22, 2004. The Union has not argued that it did not have a fair opportunity to defend the grievant against the actual grounds for the termination of his employment.

I find unconvincing the Union's assertion that the Session Notes are contrary to the reasons for discharge in the Discharge Summary and the Company's termination memorandum. Even the grievant has admitted his continuing denial, during the sessions, of an alcohol problem. Absent any expert testimony to support the Union's assertion, I shall not review determinations ultimately made, as Wade testified, by Kolmac medical staff in consultation with the counseling staff regarding an individual's continued participation in treatment sessions. My rendering of arbitral findings on medical questions based upon the brief Session Notes written by different counselors would not be appropriate.

In the same vein, I find unpersuasive the Union's contention that if management had conducted a thorough investigation, it would have uncovered the inconsistencies resulting in the grievant's erroneous discharge from the program. The original incorrect reason for the action stemmed from administrative error in the part of Value Options or Kolmac. As Duarte testified, the Company relies upon those organizations for the management of its employee assistance program and related operations.

The final question is whether the delays in issuing disciplinary action after Wade's notification to management of the grievant's discharge from the program violate notions of fairness or industrial due process. The Continued Employment Meeting

14

memorandum was issued nine months after the Kolmac discharge and four months after Dr. Schulman's report. The termination memorandum was issued almost four months after the Continued Employment Meeting.

The lengthy delay can be attributed to both management and the grievant. After discharge from the program, the grievant was on sick pay until the end of April 2004. During this period and before the DML arbitration award issued in mid-December 2003, management, the Union and the grievant were discussing settlement of the dispute. Also, the grievant, represented by private counsel, and management unsuccessfully attempted to resolve the dispute in mediation. Duarte testified without contradiction that he had called the Union over a period of time regarding two different Company offers of reinstatement which, the Union said, the grievant was still discussing. It appears that the parties' impasse concerned the implementation of Dr. Schulman's finding that the grievant "does require alcohol rehabilitation treatment as a condition of his return to work" and the recommendation that "he resume appropriate treatment."

Even assuming that the settlement discussions continued through April 30, 2004, while the grievant was out on sick pay, management took no action until July 16, 2004, when the Continued Employment Meeting memorandum was issued. Shortly after the meeting was adjourned on July 22, 2004, Duarte received a copy of the Discharge Summary, presumably before the end of July 2004. The record contains no specific explanation for management's delay of more than three months in issuing the termination memorandum.

Absent a specific showing, or even an argument, that the delays in implementing the discipline prejudiced the grievant in his defense, I find no basis for overturning the

15

termination on procedural grounds. The grievant understood the DML's terms and conditions regarding entry into and successful completion of a treatment program. Restoration of his CDL following completion of the program was required for the performance of his job duties. He failed to meet these requirements after discharge from the Kolmac treatment program. Accordingly, the termination of his employment must stand.

## AWARD

The grievance is denied.

Jerome H. Ross, Arbitrator

July 18, 2005
McLean, Virginia

**EXHIBIT C**



# Certificate of Training

## This is to certify that

### Thomas Hyde

Certificate Number 9000270

has successfully completed the

### BREATH ALCOHOL TECHNICIAN RETRAINING COURSE

provided by N.I.F.C., Inc on the date listed below

(•)Proficient in 49 CFR Part 40 Procedures

(•)Proficient in Operation of Draeger Breathalyzer Model 7410

Date 9/16/02

Instructor

# Certificate of Training

This is to certify that

## Thomas Hyde

Certificate No.900l519

Has successfully completed the

### BREATH ALCOHOL TECHNICIAN TRAINING COURSE
Provided by N.I.F.C., on the date below.

• Proficient in Operation of Draeger Breathalyzer Model 7410

April 23, 1999
Date

_Nancy Schultz_
Instructor

Case No. 1:07-cv-2340 (RJL)

# EXHIBIT 2

1    SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

2    CIVIL DIVISION

3    ------------------------X

    PEPCO
4
                v.                Civil Action No. 5435-06
5
    BENJAMIN F. RAMEY
6    4251 Clay St., NE
                Defendant
7    ------------------------X

8                            Washington, D. C.
                            Wednesday, August 9, 2006
9

10

11        The above-entitled action came on for a preliminary
    injunction before the Honorable JUDITH RETCHIN, Associate
    Judge, in Courtroom Number 216, commencing at approximately
12    9:55 a.m.

13        THIS TRANSCRIPT REPRESENTS THE PRODUCT OF
        AN OFFICIAL REPORTER, ENGAGED BY THE COURT
14        WHO HAS PERSONALLY CERTIFIED THAT IT
        REPRESENTS TESTIMONY AND PROCEEDINGS OF THE CASE
15        AS RECORDED.

16            APPEARANCES:

17            On behalf of PEPCO:

18            Carter Delorme, Esquire
            Jill Flack, Esquire
19            Washington, D.C.

20            On behalf of the Defendant:

21            Pro Se
            Washington, D. C.

22

23

24

25    Robert L. Salazar
    Official Court Reporter          Telephone (202) 897-1044

1    the potential for losing your job.  But Mr. Ramey chose to

2    go with PEPCO.  So there was no illegal kidnapping of Mr.

3    Ramey.

4         The next question is whether the -- and this was

5    not a question that I was specifically asked to address, but

6    I will address it.  And that is whether the taking of the

7    breath sample was illegal.

8         I understand Mr. Ramey contends that it was

9    illegal because it was outside of DOT guidelines that say

10   that the breath sample should be taken within eight hours

11   after there is a reasonable suspicion to believe that the

12   person might be under the influence.

13        But as I read the regulation, that did not

14   preclude testing, or non DOT testing.  That PEPCO is free to

15   do its own testing if it has reason to believe, or a

16   reasonable suspicion that an employee is impaired.  And I

17   presume the reason for that is because they want to protect

18   the safety of all when they are asking an employee to

19   operate heavy equipment.  So I don't believe there was any

20   illegal taking of a breath sample from Mr. Ramey.

21        Now the question then becomes, were the test

22   results altered?  Because that is an allegation that Mr.

23   Ramey is making.

24        And Mr. Ramey appears to be contending that they

25   were altered because a copy that was given to him did not

1   ~~ave the results printed in the right margin. But that is~~

2   ~~explained, or explainable. Because I understand that at the~~

3   ~~time he signed the form the results were not attached to it.~~

4   ~~They were just attached to it after he signed the form, that~~

5   ~~the results do not appear to be altered at all.~~

6            The results that have been presented consistently

7   are that he first had a blood -- or a breath test of .070.

8   And the subsequent test to verify that thereafter I believe

9   was .065. Yes, it was .065. And there's been no indication

10  that that has been changed at all.

11           Let me also add on the subject of whether or not a

12  date was changed. I don't believe there was any date

13  changed, whether it was August 30th or August 31. I know

14  that sometimes when I sign court orders that are supposed to

15  be official records, sometimes I just put down the wrong

16  date. And that gets picked up by someone else who then gets

17  confused about the date. But the sequence here is that Mr.

18  Hyde, in fact, came to the PEPCO offices on 9th Street to do

19  the test while Mr. Ramey was continuously in custody. And

20  in custody is probably not the right word. He was not in

21  custody for purposes of being under arrest, but while he was

22  consistently in the presence of PEPCO representatives. So

23  that there is no question that these are the test results

24  from the reasonable suspicion episode.

25           And then the next question is whether Mr. Hyde was

1    a certified technician?

2          And Ms. Flack testified that she saw the papers

3    indicating that he was certified and that he did have

4    incorporation papers.

5          Ms. Davis testified that Ms. Flack acknowledged to

6    her that she knew that Mr. Hyde was an uncertified

7    technician.  I do not believe that Ms. Davis is

8    intentionally misrepresenting.  I believe that Ms. Davis

9    misinterpreted what Ms. Flack said.  And Ms. Flack did not

10   acknowledge that Mr. Hyde was an uncertified technician.

11         It makes no sense that they went to all this

12   effort to find a certified technician for Ms. Flack to have

13   acknowledged that he was uncertified.  The fact finder in

14   the earlier proceeding found that he was a certified

15   technician.  And I just have not been presented with any

16   evidence that he was uncertified except for Ms. Davis'

17   statement that she alleges Ms. Flack made.  I find Ms. Davis

18   misinterpreted what Ms. Flack said.

19         So, I believe the plaintiff is able to prove by a

20   substantial likelihood that plaintiff would prevail on the

21   merits on the claim that those statements were false.

22         Now, the next issue the Court needs to decide is

23   whether there is irreparable harm.  And although the Court's

24   personal opinion is that a passerby and even an employee

25   might be able to give the appropriate weight to a

# EXHIBIT 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BENJAMIN RAMEY,             )
                              )
        Plaintiff,          )
                              )
        v.                )     No. 07-2132 (RJL)
                              )
POTOMAC ELECTRIC POWER     )
COMPANY,                  )
                              )
        Defendant.     )

## DEFENDANT'S MOTION TO DISMISS

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure,

Defendant Potomac Electric Power Company ("Pepco") hereby moves for the entry of an Order

dismissing Plaintiff's Complaint in its entirety.  In support of its Motion, Pepco respectfully

refers the Court to the attached Memorandum.

Respectfully submitted,

_____/s/_____
Connie N. Bertram (Bar No. 435840)
Winston & Strawn LLP
1700 K St., NW
Washington, D.C. 20006
(202) 282-5000
(202) 282-5100 (fax)

Jill D. Flack (Bar No. 420020)
Associate General Counsel
Potomac Electric Power Company
701 9th Street, NW
Washington, D.C. 20068
(202) 872-2756
(202) 872-3281 (fax)

Counsel for Defendant

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BENJAMIN RAMEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-2132 (RJL) |
| | ) | |
| POTOMAC ELECTRIC POWER | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure,

Defendant Potomac Electric Power Company ("Pepco") submits its Memorandum in Support of

its Motion to Dismiss Plaintiff's Complaint.

## I.    INTRODUCTION AND SUMMARY

In his Complaint, Plaintiff asserts a single claim for "Wrongful Termination" against his

former employer, Pepco.  Plaintiff alleges that on September 1, 2003, his manager accused him

of being intoxicated and required him to take a breathalyzer test.  Comp. ¶¶ 1-2.  He further

alleges that, because the test results indicated that his blood-alcohol level was 0.065, Pepco

required Plaintiff to enroll in an alcohol treatment program.  Id. at ¶ 3.  Plaintiff also alleges that

he was discharged from the program because he "had taken sick" because of the alcohol testing

and placement in the program.  Id. ¶¶ 2-3.  Plaintiff alleges that he was wrongfully terminated for

"being accused of being intoxicated."  Id. at ¶¶ 4-8.  Plaintiff seeks compensatory and punitive

damages for his alleged wrongful termination.  Id. at 2.

This is the eighth separate lawsuit or proceeding that Plaintiff has filed against Pepco

challenging his breathalyzer testing and Pepco's decision to discipline and termination him.

Pursuant to the collective bargaining agreement ("CBA") between Plaintiff's union and Pepco,

Plaintiff filed two grievances – the first challenging his "decision making leave" ("DML") and the second challenging his termination.  Both of these grievances were denied by Pepco and the arbitrators, who found that Pepco lawfully and validly tested, disciplined and terminated Plaintiff.

Dissatisfied with the rulings against him, Plaintiff filed negligence and intentional infliction of emotional distress claims in this Court challenging his testing, discipline and termination.  See Ex. 1 at ¶¶ 33-44.  In its March 31, 2006 decision, this Court dismissed each of Plaintiff's claims and granted summary judgment in Pepco's favor.  The Court held that Plaintiff's common law tort claims were barred by the D.C. Worker's Compensation Act ("WCA").  Ramey v. Potomac Elec. Power Co., 468 F. Supp. 2d 51 (D.D.C. 2006) (Leon, J.) ("Ramey I").  On the issue of WCA exclusivity, the Court held in its ruling on summary judgment that

> Plaintiff's common law claims are preempted by the District of Columbia Worker's Compensation Act, D.C. Code §§ 32-1504(a). Courts have consistently found that the common law claims brought by the plaintiff are the type of claims for which the Worker's Compensation Act is designed to be the exclusive remedy.  Because the D.C. Worker's Compensation Act is the exclusive remedy for the common law claims brought by the plaintiff, these claims are dismissed.

Id. at 55-56.  This ruling was summarily affirmed on appeal on December 18, 2006.  See Ex. 2.[1]

In his most recent lawsuit, Plaintiff asserts a single common law tort claim for wrongful discharge.  As explained in detail below, even if the allegations of Plaintiff's Complaint are taken as true for purposes of this motion, Plaintiff also cannot sustain this claim against Pepco for three distinct reasons.  First, as with the claims asserted in Ramey I, Plaintiff's tort claim for wrongful discharge is barred by the WCA.  Second, Plaintiff's claim is preempted by section 301 of the

---

[1] In addition to these proceedings, Plaintiff also filed a counterclaim and two additional lawsuits against Pepco in the Superior Court asserting additional tort claims, and workers' compensation and unemployment compensation claims.  Each of these claims was also dismissed or denied.

Labor Management Relations Act because it is founded upon and requires interpretation of the CBA between Pepco and Plaintiff's union.  Third, even if Plaintiff's claim is not precluded by the WCA and preempted by section 301, it must be dismissed because Plaintiff fails to state a valid claim under the narrow public policy exception for wrongful discharge and because the claim is precluded by the doctrine of collateral estoppel.

Consequently, Plaintiff's Complaint should be dismissed in its entirety.

## II.    ARGUMENT

### A.    Plaintiff's Tort Claim Is Barred By The Workers' Compensation Act

Plaintiff's common law tort claim for wrongful discharge should be dismissed because it is barred by the WCA.

The WCA provides a comprehensive scheme for compensating employees for job-related injuries.[2]  Compensation under the WCA is intended to be the *exclusive* remedy for employees and precludes tort actions against an employer for work-related injuries.  See D.C. Code § 32-1504(a).  This statutory bar limits the jurisdiction of courts whenever there is a "substantial question" regarding whether the claimed injury is work related.  Harrington v. Moss, 407 A.2d 658, 661-62 (D.C. 1979).  A "substantial question" will be found unless the claimant satisfies the "heavy burden" of establishing that his injuries "were clearly not compensable" under the WCA. Id. (injury that resulted from workplace quarrel, even if sustained later as result of related assault, falls squarely within WCA's scope because dispute had its origin in work).

---

[2] D.C. Code § 32-1503(a)(1) covers any "injury or death of an employee that occurs in the District of Columbia if the employee performed work for the employer, at the time of the injury or death, while in the District of Columbia."  The Code further states: " 'injury' means accidental injury or death arising out of an in the course of employment, . . . and includes an injury cause by the willful act of third persons directed against an employee because of his employment."  D.C. Code § 36-301(12).

Courts have repeatedly recognized that tort claims seeking damages for an employer's actions in disciplining or terminating an employee are barred by the exclusivity provisions of the WCA. In Tekle v. Foot Traffic, Inc., 699 A.2d 410, 411 (D.C. 1997), for example, the plaintiff alleged that her supervisor grabbed her, physically restrained her, and screamed at her during a termination meeting. Id. Plaintiff brought suit against her former employer and supervisor asserting a variety of intentional torts and a negligence claim. Id. The Court found that, because the tortious conduct "grew out of [the employer's] efforts to terminate" the plaintiff, there was a "substantial question" of WCA applicability. Id. at 416.

Much like the claims in Tekle, Plaintiff's wrongful termination claim clearly is barred by the WCA's exclusivity provisions. Plaintiff claims that Pepco injured him by terminating him based on invalid breathalyzer testing that it conducted. See Comp. ¶¶ 1-3, 5. Because Pepco's alleged tortious conduct "grew out of" Pepco's efforts to test, discipline, and terminate Plaintiff in connection with his employment, there is a "substantial question" regarding the WCA's applicability. Tekle, 699 A.2d at 416. Consequently, Plaintiff's wrongful discharge claim should be dismissed. See Tatum v. Hyatt Corp., 918 F. Supp. 5, 8 (D.D.C 1994) (dismissing common law claims, finding that the Act "provide[d] the exclusive remedy for [the] plaintiff's workplace injury" arising from alleged lewd and harassing conduct of supervisor).

Indeed, the dismissal of Plaintiff's claim is mandated by the rulings of this Court and the D.C. Circuit in Ramey I. It is axiomatic that judicial decisions operate as binding precedent on the same legal issues when raised in a court of concurrent or lower jurisdiction. As the D.C. Circuit has noted, "inconsistency is the antithesis of the rule of law. For judges, the most basic principle of jurisprudence is that '[judges] must act alike in all cases of like nature'." LaShawn A. v. Barry, 87 F.3d 1389, 1393 (D.C. Cir. 1996).

- 4 -

In Ramey I, Plaintiff asserted negligence and intentional infliction of emotional distress claims that challenged Pepco's testing, disciplinary and termination of him.  In its motion to dismiss those claims, Pepco argued that Plaintiff's claims for injuries that he allegedly suffered in connection with his alcohol testing, discipline, and termination were barred by the WCA.  See Ex. 3 at 10-12.  This Court agreed and dismissed Plaintiff's claims because the WCA "is the exclusive remedy for the common law claims brought by plaintiff." Ramey I, 468 F. Supp. 2d at 51.  The D.C. Circuit summarily affirmed this dismissal, also ruling that the WCA provided the exclusive remedy for Plaintiff's injuries arising during of the course of his employment. See Ex. 2.

These prior decisions operate as binding precedent in this case because they address the very same legal issue – i.e., WCA preclusion of Plaintiff's workplace injuries – that is now before this Court.  Consistent with Ramey I and the other precedent discussed above, Plaintiff's wrongful termination claim should be dismissed.

### B.    Plaintiff's Common Law Claim For Wrongful Termination Is Preempted By Section 301 Of The Labor Management Relations Act

Plaintiff's common law claim should also be dismissed because it is preempted by section 301 of the LMRA.

It is well-settled that section 301 "provides federal-court jurisdiction over controversies involving collective-bargaining agreements" and directs federal courts to "fashion a body of federal law for the enforcement of" them. Sokos v. Hilton Hotels Corp., 283 F. Supp. 2d 42, 46 (D.D.C. 2003) (citing Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 403 (1988)).  As the Supreme Court has observed, the "preemptive force of section 301 is so powerful as to displace entirely any state cause of action for violations of [a CBA]." Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1, 23 (1983); see also Beneficial Nat'l Bank v.

Anderson, 539 U.S. 1, 8 (2003); Bush v. Clark Const. & Concrete Corp., 267 F. Supp. 2d 43, 45-46 (D.D.C. 2003).

The dismissal of preempted claims advances section 301's goal of "ensur[ing] uniform interpretation of collective bargaining agreements, and thus. . . promot[ing] the peaceable, consistent resolution of labor-management disputes." Lingle, 486 U.S. at 413. Thus, if a state law claim depends upon the meaning or requires the interpretation of a CBA, the claim is preempted. Sokos, 283 F. Supp. 2d at 46; Grandison v. Wackenhut Servs., Inc., 2007 WL 2781892, *3 (D.D.C. 2007). Put succinctly, when the "heart of the [state law] complaint [is] a . . . clause in the [CBA], that complaint arises under federal law." Caterpillar, Inc. v. Williams, 482 U.S. 386, 394 (1987).

Consistent with these well-established standards, state tort claims are preempted by section 301 if the determination of an element of the tort, such as whether the employer's actions were "wrongful," requires reference to a CBA. As the Fourth Circuit recognized in Foy v. Giant Food Inc., the determination of "whether an employer's actions in dealing with and terminating an employee are wrongful is determined *not in the abstract but necessarily by reference to the collective bargaining agreement which governs the employment relationship.*" 298 F.3d 284, 288 (4th Cir. 2002) (emphasis added); see also Hanks v. General Motors Corp., 859 F.2d 67, 69 (8th Cir. 1988) (wrongful discharge claim based on employee's discharge for failing to return to work after leave of absence preempted because court would be required to interpret CBA's discharge provisions); Grandison, 2007 WL 2781892 at *4 (D.D.C. 2007) (section 301 preempted employee's state law claims that employer violated handbook issued pursuant to

CBA).[3]

 Plaintiff's wrongful termination claim is clearly preempted by section 301 under these well-established standards. As a Pepco employee employed in the bargaining unit represented by Local 1900 of the International Brotherhood of Electrical Workers (the "Union"), the terms and conditions of Plaintiff's employment were governed by the CBA between the Union and Pepco. See Appuglies Dec., Ex. A. Article 1 of the CBA contained a management rights provision that vested in Pepco's management the right to supervise and control its operations and workforce. Id. at Art. 1. Moreover, Articles 1 and 16 of the CBA afforded Pepco the right to suspend and discipline employees and to terminate them for "just cause." Id. at Arts. 1, 16. Articles 17 and 18 of the CBA provided grievance and arbitration procedures for the resolution of disputes between Pepco and members of the bargaining unit concerning the CBA. Id. at Arts. 17-18.

 Pursuant to these provisions of the CBA, Pepco adopted a drug and alcohol testing policy. See Appuglies Dec., Exs. B-C. The policy stated that employees "in any job classification may not have a blood-alcohol concentration of 0.05% or more (or have a concentration equal to, or in excess of, a corresponding level as determined by a different diagnostic test such as a Breathalyzer) while on duty or on Company property." Appuglies Dec., Ex. B at 2. Under the policy, Pepco could require an employee to submit to a breathalyzer test to detect alcohol or drugs in his system "when there is a triggering event or reason to believe drugs or alcohol may have been used." Id. at 5. The policy also identified the discipline that would be

---

[3] See also Chester v. Washington Metropolitan Area Transit Auth., 335 F. Supp. 2d 57, 64-65 (D.D.C. 2004) (employee's breach of contract and wrongful discharge claims preempted by section 301); Sokos, 283 F. Supp. 2d at 47 (section 301 preempted plaintiff's wrongful discharge claim because it necessarily required the court to examine meaning of CBA); Brown v. Gino Morena Enters., 44 F. Supp. 2d 41, 44 (D.D.C. 1999) (employee's wrongful discharge claim subject to section 301).

applied for violations of the policy.  Id.  Moreover, any disputes concerning the policy were resolved pursuant to the grievance and arbitration provisions of the CBA.

The resolution of Plaintiff's wrongful termination claim will require the Court to interpret and apply these provisions of the CBA and the drug and alcohol policy incorporated into it.  In his Complaint, Plaintiff alleges that, on September 1, 2003, Pepco ordered him to take a breathalyzer test to determine whether he was intoxicated when he reported to work.  Comp. ¶¶ 1-2.  As alleged by Plaintiff, the test results indicated that his blood-alcohol level was 0.065%, a level that exceeded the limits of Pepco's policy.  Id.; see also Appuglies Dec., Ex. B at 2-3.  Plaintiff further alleges that, because he tested positive for alcohol, Pepco required him to enroll in a alcohol treatment program and that he was discharged from the program because he "had taken sick."  Comp. ¶¶ 2-3.  Plaintiff further alleges that Pepco wrongfully terminated him "for being accused of being intoxicated."  Comp. ¶ 6.

This claim is unquestionably founded upon and will require the interpretation of the CBA between Pepco and Plaintiff's Union.  To prevail on his tort claim, Plaintiff must prove that Pepco's alleged conduct was wrongful.  Thus, this Court will have to examine the CBA and the policy to determine whether Pepco had the right under them to (1) order Plaintiff to take a breathalyzer test; (2) administer the testing in the manner that it did; (3) discipline him pursuant to the CBA and the policy as a consequence of the test results; and (4) terminate him for failing to comply with the terms of that discipline.  As with the situation presented in Foy, these determinations cannot be made "in the abstract," but necessarily must be made by reference to the management, discipline and termination provisions of the CBA and the drug and alcohol

testing policy adopted pursuant to it.  Foy, 298 F.3d at 288.[4]

The intersection between Plaintiff's state tort claim and the CBA is vividly demonstrated

by the arbitrators' rulings on the two grievances that Plaintiff filed pursuant to the CBA.[5]  Those

grievances were founded upon the exact factual allegations set forth in Plaintiff's Complaint in

this case.  See Flack Dec., Exs. A-B.  In the December 14, 2004 and July 11, 2005 rulings

rejecting these grievances, the arbitrators interpreted a number of the provision of the CBA,

including the testing policy and the discipline and termination provisions.  The arbitrators, for

instance, ruled that:

>  (1)  Pepco had reasonable cause to test Ramey on August 30, 2003;
>
>  (2)  The testing was accurate and proper and was consistent with the CBA;
>
>  (3)  Pepco had the right to issue the DML to Ramey pursuant to the CBA;
>
>  (4)  The allegations regarding the conduct of Pepco managers during the testing, even if true, did not warrant overturning the DML;
>
>  (5)  Plaintiff's failure successfully to complete the rehabilitation program required by the DML constituted "just cause" to terminate Plaintiff; and
>
>  (6)  The delays in terminating Plaintiff did not warrant overturning the termination decision.

---

[4] See also Chapple v. National Starch & Chem. Co., 178 F.3d 501, 504 (7th Cir. 1999) (section 301 preempted state law claims based on claimed wrongful application of employer's drug policy); Flibotte v. Pennsylvania Truck Lines. Inc., 131 F.3d 21, 27 (1st Cir. 1997) (section 301 preempted state law claims because the determination of whether employer "was within its rights to require [Plaintiff] to take a drug test at the designated site . . . necessitates examination of the [CBA]"); Clark v. Newport News Shipbuilding & Dry Dock Co., 937 F.2d 934, 938 (4th Cir. 1991) (section 301 preempted state tort claims because the "rights of [employee and employer] with respect to drug testing can be resolved only by reference to the [CBA] and its express and implied provisions").

[5] The first grievance challenged the DML that Pepco issued to Plaintiff as a consequence of his alcohol testing.  The second grievance challenged Pepco's decision to terminate Plaintiff in November 2004 for violating the terms of that discipline.

See Flack Dec., Ex. A at 8-10, Ex. B at 11-15. There is no question that the Court will be

required to examine and interpret the CBA in resolving these very same allegations and claims in

this lawsuit.

Consequently, as this Court recognized in its March 31, 2006 ruling on Pepco's motion to

dismiss,[6] Plaintiff's tort claims are preempted by section 301.

### C.    Plaintiff's Section 301 Claim Is Time Barred

When section 301 preempts state law claims, the Court has the option of dismissing the

claims or converting them into section 301 claims. DelCostello v. International Bhd. of

Teamsters, 462 U.S. 151, 169 (1983). Even if this Court elected to convert Plaintiff's common

law claim into a section 301 claim, it would fail.

It is well-settled that section 301 actions must be commenced within six months of the

date that the cause of action accrues. Id.; Cephas v. MVM, Inc., 403 F. Supp. 2d 17, 23-24

(D.D.C. 2005). A cause of action under section 301 accrues on the date that the underlying

breach of the CBA allegedly occurred. Simmons v. Howard Univ., 157 F.3d 914, 917 (D.C. Cir.

1998). Claims that are not brought within the six month limitations period must be dismissed.

Id. (upholding dismissal where alleged incidents underlying preempted claims fell beyond six-

month limitations period); Cephas, 403 F. Supp. 2d. at 24 (employee's preempted section 301

claim dismissed as untimely under six-month limitation period). Because any alleged breach of

---

[6] In its March 31, 2006 ruling in Ramey I, this Court noted that "Defendants also argue that
plaintiff's common law claims are preempted by Section 301 of the [LMRA]. See 29 U.S.C. §
185. Although the Court tends to agree with defendants in the regard, because it has held that
those claims are preempted under the D.C. Workers Compensation Act, the Court need not
separately address defendants' Section 301 preemption argument."

the CBA here occurred well before six months prior to the filing of this lawsuit, Plaintiff's claim

is untimely and should be dismissed.[7]

### D.    Even If It Were Not Preempted By Section 301 Or Barred By The WCA, Plaintiff Could Not Sustain His Claim For Wrongful Termination

Even if Plaintiff's wrongful discharge claim were not barred and preempted, Plaintiff

would not be able to sustain a claim for relief.

To prove a claim for wrongful discharge in the District of Columbia, a plaintiff must

establish either an "outright refusal to violate a specific law, with the employer putting the

employee to a choice of breaking the law or losing his job," Adams v. George W. Cochran &

Co., 597 A.2d 28, 30 (D.C. 1991), or that he was terminated in violation of a "clear mandate of

public policy," Carl v. Children's Hosp., 702 A.2d 159, 164 (D.C. 1997).  This limited public

policy exception to the doctrine of at-will employment has been construed very narrowly by

District of Columbia courts.  Such an action must be "firmly anchored in either the Constitution

or in a statute or regulation which clearly reflects the particular 'public policy' being relied

upon," and "there must be a close fit between the policy thus declared and the conduct at issue."

Id. at 162, 164.  Plaintiff has not – and indeed cannot – satisfy these essential elements of a claim

for wrongful discharge.

---

[7] Additionally, under the LMRA, an employee is bound by the result of any grievance procedures provided by the CBA, subject to very limited judicial review.  Chester v. Washington Metropolitan Area Transit Auth., 335 F. Supp. 2d 57, 64-65 (D.D.C. 2004); see also Chauffeurs, Teamsters & Helpers, Local 391 v. Terry, 494 U.S. 558 (1990) (when CBA accords finality to grievance or arbitration procedures, employee generally cannot bring a section 301 claim unless he can show that his union breached its duty of fair representation in handling the grievance). Plaintiff pursued *two* grievance proceedings, each of which resulted in a final decision in Pepco's favor on the very issues now asserted by Plaintiff.  In relevant part, the arbitrators ruled that Pepco had reasonable cause to test Plaintiff's blood-alcohol level, the testing was accurate and proper, Pepco had the right to issue the DML to Plaintiff, and Pepco had "just cause" to terminate Plaintiff.  See Flack Dec., Exs. A-B.  Plaintiff is bound by the results of these grievance procedures and his section 301 claim therefore must fail.

### 1.    **Plaintiff Failed To Plead A Clear Mandate Of Public Policy**

Because Plaintiff does not allege that he was discharged for refusing to commit illegal acts, or that Pepco violated any "clear mandate of public policy," he cannot sustain a claim.

In his Complaint, Plaintiff simply recites the series of events leading to his termination, including his intoxication, his consequent enrollment in an alcohol treatment program, his subsequent termination, and his participation in an arbitration hearing for wrongful discharge. At no point does Plaintiff allege that he was asked to commit an illegal act or that he refused to violate any law. Similarly, Plaintiff does not even attempt to identify any public policy that Pepco allegedly violated by terminating his employment. In fact, he fails to cite a single statute, regulation, or other authority in support of his wrongful discharge claim.

Under these circumstances, his claim is facially invalid and must be dismissed. <u>See, e.g.</u>, <u>Wallace v. Skadden, Arps, Slate, Meagher & Flom</u>, 715 A.2d 873, 883-86 (D.C. 1998) (attorney's claim that she was terminated for refusing to violate rules of professional conduct insufficient to trigger public policy exception); <u>Mandsager v. Jaquith</u>, 706 A.2d 39, 42 (D.C. 1998) (wrongful discharge claim properly dismissed because employee's refusal to solicit financial contributions in states where employer had not registered as charitable organization did not fall within public policy exception).

### 2.    **Plaintiff Is Collaterally Estopped From Asserting A Wrongful Termination Claim**

Plaintiff's claim should also be dismissed because Plaintiff is collaterally estopped from asserting a claim for wrongful discharge.

The doctrine of collateral estoppel precludes re-litigation of an issue of fact or law determined in a prior proceeding that was essential to that judgment. <u>Montana v. United States</u>, 440 U.S. 147, 153 (1979); <u>Ali Baba Co., Inc. v. WILCO, Inc.</u>, 482 A.2d 418, 421 (D.C. 1984).

Collateral estoppel bars the assertion of a claim when that claim or a fact essential to it has already been fully litigated and decided, and preclusion would not work an unfairness to the party bound by the first determination. Consolidated Edison Co. v. Bodman, 449 F.3d 1254, 1257-58 (D.C. Cir. 2006) (citing Restatement (Second) of Judgments § 27); Meng v. Schwartz, 305 F. Supp. 2d 49, 57 (D.D.C. 2004). Collateral estoppel applies to arbitration determinations as well as to judicial adjudications. See Schattner v. Girard, Inc., 668 F.2d 1366, 1368 (D.C. Cir. 1981) (per curiam) ("a party whose claims have been decided in arbitration may not then bring the same claims under new labels.") Where an issue has been litigated and previously decided, it will be conclusive in all subsequent actions between the same parties, whether on the same or a different claim. Consolidated, 449 F.3d at 1258; Schattner, 668 F.2d at 1371.

As noted above, a claim for wrongful discharge requires that Plaintiff prove either that he was terminated because of an outright refusal to violate a specific law or that he was terminated in violation of a clear mandate of public policy. Adams, 597 A.2d at 30; Carl, 702 A.2d at 164. Plaintiff alleges that he was wrongfully terminated because he was "accused of being intoxicated" and his blood-alcohol test was forensically invalid. Comp. ¶¶ 6-8. Yet, as Plaintiff himself notes in his Complaint, these issues were already addressed and decided in Pepco's favor in the numerous proceedings between Plaintiff and Pepco. Comp. ¶¶ 4, 6-8.

For instance, in the first of two grievance hearings related to Plaintiff's discipline and termination, an arbitrator thoroughly reviewed Pepco's decision to administer a breathalyzer test, the process used, its conformity with requisite policies, and Pepco's ultimate decision to place Plaintiff on DML. The arbitrator found that:

(1)    There was nothing improper in Pepco's administration of the breathalyzer test;

(2)    There was a valid basis for the Company to require Plaintiff to undergo

"reasonable suspicion" alcohol testing;

(3)    The test was accurate, and there was no time limit for issuing the test; and

(4)    Not only was there just cause for the DML, but the DML was required.

See Flack Dec., Ex. A at 8-10.  In Plaintiff's second arbitration with Pepco, challenging his

termination, the arbitrator found that Plaintiff was terminated for "just cause" because he failed

to successfully complete the rehabilitation program required by the DML.  See Flack Dec., Ex. B

at 11-15.

Similarly, in Ramey I, this Court found that Plaintiff's termination was justified.  In

dismissing Plaintiff's tort and discrimination claims challenging his termination, the Honorable

Judge Richard Leon noted:

> Ramey ***fails to rebut defendant's showing of a legitimate,***
> ***nondiscriminatory reason for terminating his employment*** . . .
> What plaintiff appears to conveniently ignore in bringing this suit
> is the fact that defendants have produced evidence which
> demonstrates that, on the night of August 31, 2003, plaintiff
> showed up to work drunk – so drunk that when he was finally
> given a breathalyzer test, eleven to twelve hours after he was first
> confronted by his supervisor, his blood alcohol level still registered
> at 0.065% to 0.07%.  ***This is not a close call.***

Ramey I, 468 F. Supp. 2d 51, 57 n.7 (D.D.C. 2006) (emphasis added).  The D.C. Circuit upheld

this ruling, finding that "a reasonable trier of fact could not infer intentional discrimination based

on the evidence."  See Ex. 2 at 2.

In addition, in a subsequent proceeding in the District of Columbia Superior Court, the

Honorable Judge Judith Retchin presided over a full evidentiary hearing to determine whether to

enjoin Plaintiff from further defaming Pepco with false statements, including statements that he

was wrongfully terminated.  As part of this hearing, Judge Retchin assessed whether Plaintiff's

breathalyzer test was proper and valid, and reviewed whether Pepco properly tested and

- 14 -

disciplined Plaintiff.  These determinations were essential to the ultimate finding that Plaintiff's statements were in fact defamatory.[8]  See Ex. 6 at 145:4-147:21.

Judge Retchin conclusively found that Pepco conducted a legal and valid breathalyzer test:

> The next question is whether the – and this was not a question that I was specifically asked to address, but I will address it.  And that is whether that taking of the breath sample was illegal.
>
> I understand Mr. Ramey contends that it was illegal because it was outside of DOT guidelines that say that the breath sample should be taken within eight hours after there is a reasonable suspicion to believe that the person might be under the influence.
>
> But as I read the regulation, that did not preclude testing if it has reason to believe, or a reasonable suspicion that an employee is impaired….*So I don't believe there was any illegal taking of a breath sample from Mr. Ramey.*
>
> Now the question then becomes, were the test results altered?  Because that is an allegation that Mr. Ramey is making.  . . .
>
> The results that have been presented consistently are that he first had a blood – or a breath test of .070.  And the subsequent test to verify that thereafter I believe was .065.  Yes, it was .065.  *And there's been no indication that has been changed at all.*  Id.

---

[8] To prove defamation, a plaintiff must show that:  (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.  Beeton v. District of Columbia, 779 A.2d 918, 923 (D.C. 2001); Crowley v. North American Telecomms. Assoc., 691 A.2d 1169, 1173 n.2 (D.C. 1997).  Plaintiff had been distributing a flyer that stated, in part, "After I was tested, PEPCO attempted to cover up the incident by using incorrect and altered test forms, an uncertified technician and someone not employed by PEPCO.  PEPCO informed me that I tested positive and asked me to sign the alcohol test form….The copy I was given for my record DID NOT match the copy placed in my file.  I NEVER tested positive for the use of alcohol.  I was asked to leave PEPCO and not to return."

Consistent with her findings, Judge Retchin issued a preliminary injunction enjoining Plaintiff "from making, whether in writing or orally, false and defamatory statements against Pepco, including, but not limited to, statements that Pepco, or its employees, agents or attorneys kidnapped, falsely imprisoned, *illegally altered his Breathalyzer results, used an uncertified technician to administer the Breathalyzer or committed any other illegal act against him in connection with his termination from Pepco* or the filing of this action." <u>See</u> Ex. 7 (emphasis added). Judge Retchin subsequently granted summary judgment in favor of Pepco on its defamation claim and converted this preliminary injunction into a permanent injunction. <u>See</u> Ex. 8.

These factual and legal findings are final and determinative, and apply to all subsequent proceedings between Plaintiff and Pepco. <u>Consolidated</u>, 449 F.3d at 1258. Because these fact-finders held that Plaintiff's breathalyzer test was properly conducted and was valid and that his termination was justified, Plaintiff is precluded from now re-litigating those issues through his wrongful discharge claim. As such, he cannot now claim wrongful termination on grounds that his testing was invalid or that his termination was not justified. In fact, given these rulings, Plaintiff is unable to state any claim entitling him to relief. <u>See</u> <u>Kovach v. District of Columbia</u>, 805 A.2d 957, 963 (D.C. 2002) ("because principles of collateral estoppel preclude appellant from alleging a fact necessary to stating a claim, the trial court correctly granted appellee's motion to dismiss"). Plaintiff's claim should therefore be dismissed.

III.    **CONCLUSION**

For the foregoing reasons, Pepco respectfully requests that the Court enter an Order

dismissing Plaintiff's claim against it with prejudice.

Respectfully submitted,


_____/s/_____
Connie N. Bertram (Bar No. 435840)
Winston & Strawn LLP
1700 K St., NW
Washington, D.C. 20006
(202) 282-5000
(202) 282-5100 (fax)

Jill D. Flack (Bar No. 420020)
Associate General Counsel
Potomac Electric Power Company
701 9th Street, NW
Washington, D.C. 20068
(202) 872-2756
(202) 872-3281 (fax)

Counsel for Defendant

December 3, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of December 2007, I caused a true and correct copy of

the foregoing Motion to Dismiss and Memorandum in Support to be served by first class mail,

postage prepaid on this 3rd day of December, 2007, on the following:

> Benjamin Ramey
> 4251 Clay Street, NE
> Washington, DC 20019


_____/s/_____
Connie N. Bertram

DC:518580.1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BENJAMIN RAMEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-2340 (RJL) |
| | ) | |
| POTOMAC ELECTRIC POWER | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>O R D E R</u>

Upon consideration of Defendant Potomac Electric Power Company's Motion to Dismiss,

and the parties' briefing on it, the Court orders as follows:

Defendant's Motion to Dismiss Plaintiff's Complaint is GRANTED and Plaintiff's

Complaint is DISMISSED with prejudice.

ORDERED this ___ day of _____.


_____
U.S. District Court Judge