**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BENJAMIN RAMEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-2340 (RJL) |
| | ) | |
| POTOMAC ELECTRIC POWER | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS**</u>

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure,

Defendant Potomac Electric Power Company ("Pepco") submits its Reply in Support of

its Motion to Dismiss Plaintiff's Complaint.

**I.    <u>INTRODUCTION</u>**

Plaintiff cannot avoid dismissal of the most recent of the nine lawsuits and

proceedings he has filed against Pepco challenging his 2003 alcohol testing.  Despite his

various opinions about how the law should be, his vigorous, offensive attacks on Pepco

and its counsel, and his hodgepodge of various items of "evidence" concerning the

testing, Plaintiff simply cannot sustain a claim against Pepco under the Motor Carrier Act

(the "Act").  His concessions that he did not obtain a DOT enforcement order against

Pepco and (through his silence) that he cannot seek personal injuries through such a suit

mandate the dismissal of his claim.  Moreover, Plaintiff simply cannot overcome the

rulings of numerous tribunals rejecting his challenges to Pepco's testing and holding that

the testing was not governed by the Act or FMCSR and was properly conducted.

Consequently, Plaintiff's claim under the Act should be dismissed with prejudice.

## II.    ARGUMENT

### A.    Plaintiff Fails To Rebut Pepco's Showing That He Cannot Pursue A Private Suit Under The Act

Pepco established that Plaintiff could not maintain a private suit under the Act for alleged violations of the safety provisions of the FMCSR for three distinct reasons:  (1) he did not file a timely complaint with DOT; (2) DOT did not enter an enforcement order against Pepco; and (3) even if he had filed a timely complaint (resulting in the issuance of a compliance order), he could not maintain a claim seeking damages for personal injuries. Pepco Mem. at 2-3.  Because Plaintiff did not even attempt to respond in his opposition to argument (3), it is deemed conceded and Pepco's motion should be granted for that reason alone.  Bancoult v. McNamara, 227 F. Supp. 2d 144, 149 (D.D.C. 2002) ("if the opposing party files a responsive memorandum, but fails to address certain arguments made by the moving party, the court may treat those arguments as conceded, even when the result is dismissal of the entire case").[1]

Although Plaintiff attempted in his opposition to address arguments (1) and (2), he failed to present any valid response.  Plaintiff first takes issue with the filing deadline itself, claiming that "there is no statute of limitations recorded in Pepco's policy, the [CBA], or the FMCSR . . . handbook."  Opp. at 2.  However, the filing deadline was

---

[1] See also United States v. Real Prop. Identified as Parcel 03179-005R, 287 F. Supp. 2d 45, 62-62 (D.D.C. 2003) (failure to address an argument equates to a concession of that argument under the Local Civil Rule 7(b)); Day v. Department of Consumer & Regulatory Affairs, 191 F. Supp. 2d 154, 159 (D.D.C. 2002) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded"); Hopkins v. Women's Div. Gen. Bd. of Global Ministries, 238 F. Supp. 2d 177, 178 (D.D.C. 2002) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded").

unquestionably included in the regulations themselves.  49 C.F.R. § 386.12 provides that "a person may file a written complaint with the Assistant Administrator alleging that a substantial violation . . . has occurred within the preceding 60 days."  Regardless of whether it was included in the policies and handbooks that Pepco provided to him, Plaintiff was bound by that filing deadline.

Plaintiff also argues that, even if a 60-day filing deadline applied, Pepco "cannot present any proof" that his claim is untimely "because there is not any."  Opp. at 1.  However, the very letter that Plaintiff attaches to his opposition shows that he filed his complaint with DOT challenging his testing on October 27, 2004, well after the expiration of the 60-day filing period.  See Opp., Ex. 1.  In any event, it is Plaintiff – not Pepco – who bears the burden of proving that he complied with the procedural prerequisites for his purported claim under the Act.

In an attempt to excuse his untimely filing, Plaintiff also offers the bare assertion that "the labor relations office do [sic] not except [sic] filing [sic] from an individual, if that complaint was active in court."  Opp. at 1.  It is unclear who or what the "labor relations office" is and whether this statement is based on Plaintiff's own experiences or his interpretation of the Act and regulations.  If Plaintiff is referring to the filing of an administrative complaint with DOT, there is no provision in the Act or the FMCSR that precludes a complainant from filing a DOT complaint if he has a lawsuit pending.  See 49 U.S.C. §§ 14701-05.[2]

---

[2] In any event, Plaintiff cannot establish that the DOT did not allow him to file a timely complaint because (1) he did not have a civil suit pending during the 60-day deadline for filing with the DOT, and (2) in any event, he filed his October 27, 2004 complaint with DOT *after* he filed his first lawsuit against Pepco on October 18, 2004 challenging his testing.

In his opposition, Plaintiff does not take issue with Pepco's second argument, conceding that "for some reason" DOT did not take any action against Pepco in response to his complaint.  Opp. at 2.  Because, as Pepco established, Plaintiff cannot maintain a private cause of action against Pepco absent the entry (and subsequent violation) of a compliance order, this concession is fatal to his claim.  See Schramm v. Foster, 341 F. Supp. 2d 536, 547 (D. Md. 2004) (no private cause of action available under Act for personal injuries arising out of alleged violation of safety regulations related to maximum driving hours); see also Pepco Mem. at 2-3.  Consequently, his claim under the Act should be dismissed.

**B.    Plaintiff Fails In Any Event To Establish That Pepco Violated The Act Or The FMCSR**

**1.    The Testing Was Conducted Pursuant To Company Policy, Not The FMCSR**

In its memorandum, Pepco established that the Act and the FMCSR did not govern the ***non-DOT*** alcohol test conducted by Pepco.  See Pepco Mem. at 3-6.  In his opposition, Plaintiff offers several theories as to why the testing conducted by Pepco was subject to FMCSR testing requirements.  Opp. at 2-3.  None of these theories, however, has any merit whatsoever.

Plaintiff offers the testimony of David Duarte, claiming that he conceded that Pepco "was bound by DOT" standards in conducting its testing of Plaintiff.  Opp. at 2.  Pepco does not dispute that, as Duarte explained in his testimony, Pepco is subject to DOT provisions concerning the testing of drivers.  Id.  However, as Duarte also explained in portions of the transcript that Plaintiff neglected to attach, Pepco also has a separate alcohol testing policy that has "nothing to do" with DOT testing, and Plaintiff was tested

pursuant to that policy because more than eight hours had passed after reasonable suspicion arose.  See Ex. A at 212-14.

Plaintiff also offers up his own interpretations of DOT's eight-hour testing limitation, asserting that "DOT require [sic] an employer to cease testing after eight hours" because it did not want "a large employer to detain an employee" for that long. Opp. at 2.  A review of the history and application of this provision does not support the interpretation offered by Plaintiff.  Indeed, the regulatory history shows that DOT imposed its time limitations in order to encourage employers to perform testing as quickly as possible, which would make it less "likely that someone who had violated the Department's regulations could avoid accountability of his or her actions."  See 60 Fed. Reg. 19675-01 (Apr. 20, 1995).

Citing a decision from his unemployment proceeding, Plaintiff also argues that, because reasonable suspicion did not arise until 4:00 a.m., DOT provisions governed the testing because "the test was conducted within eight hours."  Opp. at 2.  This argument is contrary to Plaintiff's own sworn testimony and each and every allegation and statement that Plaintiff has made in his numerous proceedings against Pepco, including his Complaint in this case.  In any event, contrary to Plaintiff's representations, Judge Govan did not find that reasonable suspicion arose at 4:00 a.m. and did not address the eight-hour issue.[3]  Each and every fact finder who has considered the issue has concluded that the testing was conducted after the expiration of the eight-hour period and, therefore, was not subject to DOT testing provisions.  See Pepco Mem. at 4-6.

---

[3] See Ex. B at 3-4, 8.  Based on the testimony of Gregory Johnson, see Ex. A at 130-36, Judge Govan noted that Pepco first suspected that Plaintiff was intoxicated at 3:00 a.m. Judge Govan further found that "[o]n August 30, 2003 at 11:32 a.m., two successive Breathalyzer tests were administered to claimant."  See Ex. B at 4.

Plaintiff also attempts again to challenge Pepco's showing that it had the right to conduct the testing pursuant to its policies and the CBA after the eight-hour period expired, broadly asserting that "no company policy can supercede [sic] a federal law." Opp. at 2. Pepco, however, did not attempt in any way to "supersede" federal law. It merely, consistent with 49 C.F.R. § 382.111, applied its own policies to a situation that was not covered by FMCSR provisions concerning driver testing. See Browning-Ferris Indus. v. Indiana Dept. of Workforce Dev., 693 N.E.2d 1351, 1353-55 (Ind. Ct. App. 1998) (employer can impose more stringent drug and alcohol policy than that provided by DOT); see also Pepco Mem. at 3-4.

Plaintiff also argues in his opposition that Pepco's policies concerning alcohol testing only applied to administrative employees, asserting with no evidentiary support that "Pepco is only required to use non-DOT test [sic] for non-DOT employees." Opp. at 1-2. Even though this argument is entirely immaterial to Plaintiff's claim that Pepco violated *DOT* provisions, it is belied by the policies themselves. The policy, by its own terms, applies to "an employee in any job classification," and was incorporated into the CBA that governed Plaintiff's employment with Pepco. See Notice of Removal, Ex. B (filed Dec. 31, 2007); Appuglies Dec., Ex. B, attached hereto as Ex. C. Thus, as each and every factfinder has found, Plaintiff was bound by the testing provisions and BAC limitations of that policy. See Pepco Mem. at 4-6.

## 2. Collateral Estoppel Precludes Plaintiff's Various Attempts To Show That The Testing Conducted By Pepco Was "Forensically Invalid"

Because Plaintiff failed to rebut Pepco's showing that the Act and FMCSR did not govern its testing, it is unnecessary to consider the merits of any of Plaintiff's various

challenges to it. Even if Plaintiff could somehow overcome the impediments discussed above and pursue a claim under the Act challenging the testing, he plainly could not establish that Pepco violated the Act or FMCSR by conducting testing that was not governed by it. However, even if the Court chooses to delve into the arguments and so-called evidence Plaintiff offers in support of his claim that the testing was "forensically invalid," they are barred by the doctrine of collateral estoppel.

Plaintiff relies in his opposition on the testimony of Thomas Hyde, the technician who conducted his testing in Plaintiff's DOES proceeding, claiming that Hyde testified that "Pepco waited too long" to test. Opp. at 3. Hyde merely testified that he advised Duarte that, because more than eight hours had passed, non-DOT forms had to be used for the testing. Ex. A at 163, 165, 170-71, 177. After considering Hyde's testimony and the testimony of numerous other live witnesses, and offering Plaintiff the opportunity to present his various arguments challenging the validity of Pepco's testing, the ALJ concluded that the testing did not violate DOT provisions and was proper. See Ex. B at 4-5, 7. This ruling and the numerous other findings upholding Pepco's testing bar Plaintiff from pursuing any claim challenging it. Pepco Mem. at 4-6.[4]

In what appears to be an effort to rebut the numerous factual findings that his testing was proper, Plaintiff also again attaches to his opposition a July 19, 2007

---

[4] Plaintiff also argues for the first time in his opposition that Pepco violated the FMCSR because it deleted the word "federal" from the top of his urine test results. Opp. at 3. Plaintiff cannot sustain a claim for this claimed violation for innumerable reasons, including (1) Plaintiff did not file a DOT complaint challenging this claimed violation or obtain a compliance order addressing it; (2) there is no cause of action available under the statute for this claimed violation or for the recovery of the damages Plaintiff seeks; (3) he is barred by collateral estoppel from presenting new evidence and from challenging the legality of Pepco's testing; and (4) marking out the word "federal" on the form does not constitute a "fraudulent or intentionally false statement" within the meaning of 49 C.F.R. § 390.35.

memorandum to Plaintiff's prior counsel from a criminal defense attorney named Bryan Brown. Brown offers his opinion that the breathalyzer testing that Pepco performed on Plaintiff was not undertaken consistent with the testing standards set forth in the "U.S. Capital Police Breath Testing" manual and was "highly unreliable." This so-called "evidence" is entirely inadmissible and is irrelevant in any event to the issues raised in Pepco's motion.

This memorandum should be stricken and should not be considered by the Court in ruling on Pepco's motion. As with the other random exhibits attached to his opposition, Plaintiff did not even attempt to authenticate this memorandum through testimony or an affidavit as required by Rule 56(e).[5] Because Brown was not personally involved in the testing at issue and has no personal knowledge concerning it, the admission of his statements is also barred by Rule 56(e) and Rule 602. Moreover, his memorandum contains out-of-court statements offered for the truth of the matter asserted, which constitutes hearsay that does not fall within any of the recognized exceptions in Rule 803.

Although Brown describes his background and experience, presumably to establish that he is some type of "expert," he has not been qualified as an expert to render an opinion concerning Pepco's alcohol testing policies. By his own description, his experience with breathalyzer testing is limited to "U.S. Capital Police" testing standards and to defending criminal cases in the District of Columbia. Brown does not even purport to have experience with the internal company policies and CBA provisions that

---

[5] As was the case in Ramey I, because Plaintiff purported to submit evidence in connection with his opposition, Pepco's motion should be converted to a Rule 56 motion for summary judgment and his evidence should be assessed pursuant to the standards of Rule 56(e). See 468 F. Supp. 2d at 55.

Pepco applied in testing, disciplining and terminating Plaintiff.  Thus, his proffered "opinions" concerning Pepco's testing is not admissible pursuant to Rule 702.

In any event, this memorandum is irrelevant to the issues raised in Pepco's motion.  It does not in any way respond to Pepco's showing that its testing did not violate DOT provisions and that collateral estoppel bars his claim.  Pepco Mem. at 3-6. Although the memorandum purports to address certain of the prior factual findings concerning Plaintiff's testing and termination that support Pepco's collateral estoppel argument, see Pepco Mem. at 4-6, an inadmissible, after-the-fact "opinion" of an attorney cannot overcome the numerous, binding factual findings – including findings of this Court – that Pepco's testing was proper.  See id..

Plaintiff simply cannot avoid the preclusive effect of the prior rulings against him. Plaintiff has – time and time again – offered his various theories challenging the validity of Pepco's testing.  Because a universal chorus of factfinders has rejected them and concluded that Pepco's testing was proper and did not violate DOT provisions, Plaintiff cannot pursue this or any other claim in this Court.  See Pepco Mem. at 4-6. Consequently, Plaintiff's claim should be dismissed with prejudice.[6]

---

[6] In its memorandum, Pepco offered the alternative argument that, if Plaintiff's claim could be construed as some type of state tort claim, it would also be barred by the applicable statute of limitations.  Because Plaintiff did not even suggest in his opposition that he is asserting any type of tort claim and did not respond to Pepco's arguments, this alternative argument need not be considered by the Court.

III.    <u>CONCLUSION</u>

For the foregoing reasons and the reasons set forth in Pepco's memorandum,

Pepco respectfully requests that this Court dismiss Plaintiff's Complaint with prejudice.

Respectfully submitted,

_____/s/_____
Connie N. Bertram (Bar No. 435840)
Winston & Strawn LLP
1700 K St., NW
Washington, D.C. 20006
(202) 282-5000
(202) 282-5100 (fax)

Jill D. Flack (Bar No. 420020)
Associate General Counsel
Potomac Electric Power Company
701 9th Street, NW
Washington, D.C. 20068
(202) 872-2756
(202) 872-3281 (fax)

Counsel for Defendant

January 25, 2008

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 25th day of January 2008, I caused a true and correct

copy of the foregoing Defendant's Reply in Support of its Motion to Dismiss to be served

by first class mail, postage prepaid, on the following:

Benjamin Ramey
4251 Clay Street, NE
Washington, DC 20019


_____/s/_____
Connie N. Bertram

Case No. 07-2340 (RJL)

# Exhibit A

jhl

JH

1

GOVERNMENT OF THE DISTRICT OF COLUMBIA

DEPARTMENT OF EMPLOYMENT SERVICES

HEARINGS AND ADJUDICATION SECTION

- - - - - - - - - - - - - - - x
BENJAMIN F. RAMEY,                :
         Claimant,               :
    v.                           :   OHA No. 05-318
POTOMAC ELECTRIC POWER           :   OWC/ODC No. 608087
COMPANY,                         :
         Employer,               :
      and                        :
CHC,                             :
         Carrier.                :
- - - - - - - - - - - - - - - x

RECEIVED
SEP 1 9 2005
LEGAL SERVICES

Wednesday, August 17, 2005

64 New York Avenue, N.E.
Washington, D.C. 20002

The hearing in the above-entitled matter

was convened, pursuant to notice, at 2:26 p.m.

BEFORE:

AMELIA G. GOVAN
Administrative Law Judge

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

jhl

1       Q    What time did Mr. Ramey report to work on

2   the evening of the 29th?

3       A    Midnight.

4       Q    Did you see him when he came in?

5       A    Mr. Ramey reported to me, stuck his head

6   in the office and made his presence known that he

7   was on duty.  Made his presence known that he was

8   on duty.

9       Q    Did he subsequently approach you and ask

10  you if he could go out and get some cigarettes?

11      A    Mr. Ramey later came to me and asked--and

12  told me that he ran out of cigarettes and could he

13  go get him a pack of cigarettes.  I told Mr. Ramey,

14  yes, he could go get a pack of cigarettes and

15  report back to me once he got back with the pack of

16  cigarettes.

17      Q    About what time was that that you told him

18  he could go get cigarettes?

19      A    That was approximately 0100 hours.

20      Q    0100 hours being 1:00 a.m.?

21      A    Yes.

22      Q    That's 1:00 a.m. on August 30th?

jhl

131

1        A    Yes.

2        Q    He went to get his cigarettes.  When was

3    the next time you saw Mr. Ramey?

4        A    Approximately at 3:00 that following

5    morning--that same morning.  An assignment came up

6    and I needed Mr. Ramey to drive a CDL vehicle, a

7    vehicle weighing over 26,000 pounds.

8        Q    Where was Mr. Ramey?

9        A    Mr. Ramey--I got involved with some other

10   paperwork, and Mr. Ramey did not report back to me.

11   So I asked the crew to find Mr. Ramey.

12       Q    Did you see him at all in between

13   1 o'clock when he went to get cigarettes and

14   3 o'clock when you needed him?

15       A    No, I did not.

16       Q    Where did the crew find him?

17       A    Mr. Ramey was later found in his car in

18   the employee parking lot.

19       Q    What are the rules there about being in

20   the employee parking lot after reporting to work?

21       A    Once you report to work whether it's

22   normal working hours or overtime hours or on storm

jhl

132

1   duty, the employee parking lot is off limits unless

2   you get permission from your--the supervisor that

3   you're working for.

4       Q    Who reported to you that they had found

5   Mr. Ramey?

6       A    Mr. Joe Kackley.

7       Q    What did he say to you?

8       A    That he had located Mr. Ramey, and I had

9   told Mr. Kackley to instruct Mr. Ramey to report to

10  me in my office.

11      Q    Why was that?

12      A    I wanted Mr. Ramey to drive a 26,000-pound

13  vehicle to a job assignment.

14      Q    Did he drive the vehicle?

15      A    No, Mr. Ramey did not drive the vehicle.

16      Q    Why is that?

17      A    When Mr. Kackley found him, Mr. Kackley

18  reported back to me and said that Mr. Ramey

19  wouldn't be able to drive, he was in condition to

20  drive, and that--that he volunteered that he would

21  drive the vehicle himself, Mr. Kackley.

22      Q    Did you subsequently speak with Mr. Ramey?

jhl

133

1      A     After another employee came in and

2   reported the same concerns--

3      Q     What concern?

4      A     That Mr. Ramey was in--

5            MS. MENDOZA:  Objection.  Hearsay.

6            JUDGE GOVAN:  I'll allow it.

7            THE WITNESS:  That Mr. Ramey was in no

8   shape to drive any vehicle.

9            BY MR. O'CONNELL:

10     Q     You then saw Mr. Ramey?

11     A     Then Mr. Ramey came into my office, yes.

12     Q     Did you speak with Mr. Ramey?

13     A     I spoke to Mr. Ramey.  Yes, I did.

14     Q     Did you observe his appearance?

15     A     Yes, I did.

16     Q     Did you observe the way he was speaking?

17     A     Mr. Ramey's speech was completely slurred.

18  His words were very inaudible, that I couldn't

19  understand what he was saying to me.  Mr. Ramey had

20  a saying that just kept repeating was, what seldom

21  is so--what seldom appears to be so is so, and that

22  was the extent of what was legible for me to

jhl

134

1   understand from Mr. Ramey.

2       Q    Did you say anything to him about his

3   condition?

4       A    I came from behind my desk and I

5   approached Mr. Ramey and I could smell alcohol on

6   Mr. Ramey, and I asked Mr. Ramey to stay in my

7   office.

8       Q    Did you observe anything about his

9   physical appearance?

10      A    Mr. Ramey appeared to be unsteady on his

11  feet.  His eyes were a little bloodshot, and his

12  speech was completely slurred.

13      Q    At that point in time you contacted a

14  supervisor?

15      A    At that time I called my complaint desk

16  and got my supervisor's telephone number at home.

17  After calling my supervisor at home, he instructed

18  me to call back the complaint desk and get a

19  representative from human resources to respond to

20  my concerns.

21      Q    You concern stated to them was what?

22      A    My concern is that Mr. Ramey was in no

jhl

135

1    condition to drive a vehicle--a CDL vehicle because

2    I could smell alcohol on him.

3        Q    You eventually spoke with Dr. Duarte?

4        A    I eventually spoke to--

5            MS. MENDOZA:  Objection.  Leading.

6            MR. O'CONNELL:  I'm trying to move this

7    along, and I don't think that this is

8    controversial.

9            JUDGE GOVAN:  Let's move on.

10            THE WITNESS:  I eventually spoke to

11    Mr. Duarte and Mr. Duarte gave me instructions to

12    bring Mr. Ramey to our headquarters on 9th Street,

13    to Edison Place.

14            BY MR. O'CONNELL:

15        Q    So we're clear, Edison Place is the main

16    PEPCO building?

17        A    Yes, it is.

18        Q    You went from Benning to Edison?

19        A    Yes, I did.

20        Q    When you arrived at Edison where did you

21    go?

22        A    I went up to Mr. Duarte's office.

jhl

136

1     Q    Did you have Mr. Ramey with you?

2     A    Mr. Ramey was with me.

3     Q    You went into Duarte's office?

4     A    Yes, sir.

5     Q    Where did the respective people in that

6  office sit and stand?  Where were they?

7     A    Mr. Duarte was sitting behind his desk, I

8  was sitting to the--I think it was to the left of

9  Mr. Duarte, and Mr. Ramey was sitting in front of

10 Mr. Duarte on the opposite side of his desk facing

11 him.

12    Q    What time was this?

13    A    This was approximately between 0300 and

14 0400 hours, between 3:00 a.m., 4:00 a.m., 5:00 a.m.

15 in the morning.

16    Q    Did a conversation occur between

17 Mr. Duarte and Mr. Ramey?

18    A    Yes, it did.

19    Q    Did Mr. Duarte make any threatening

20 statements or movements toward Mr. Ramey?

21    A    No, he did not.

22    Q    Did Mr. Ramey make any movements toward

jhl

163

1      Q      Thank you.  Do you have any reason to

2   doubt the validity of the test?

3      A    No, sir.

4      Q      There has been testimony that there was

5   confusion over forms that were being used.  Was

6   there any confusion over forms?

7      A      Not on the breath form, no.  There was a--

8   not confusion, but a lack of form for the drug

9   test.

10     Q      What do you mean when you say drug test as

11  opposed to alcohol?

12     A      Mr. Ramey was administered an alcohol and

13  a drug test, a urine drug test.

14     Q      He had a urine drug test?

15     A      Yes, sir.

16     Q      The confusion was the lack of a form?

17     A      The lack of a form, yes.

18     Q      Which was for the drug urine test?

19     A      Correct.

20     Q      Did you ever tell anyone present that the

21  test was illegal?

22     A      Illegal?  No, sir.

jhl

165

1    Q    PEPCO uses Department of Transportation

2  testers.  Isn't that correct?

3    A    I'm not--I'm not sure what you mean by

4  that question.

5    Q    I mean that under the Department of

6  Transportation regulations, PEPCO ordinarily uses

7  people who are licensed or work for the federal

8  government.  Isn't that correct?

9    A    I don't think so.  They hire independent

10  contractors to come in and perform the tests.

11    Q    But the people that do the tests use

12  Department of Transportation guidelines and

13  paperwork and forms?

14    A    If--if they're doing DOT tests on those

15  employees, yes.  If they're testing employees for

16  other than DOT requirements, they would not

17  follow--use the DOT form, no.

18    Q    If you're an employee working for PEPCO

19  and you're a conduit worker or driving heavy

20  machinery, wouldn't that be Department of

21  Transportation required?

22    A    Could be.  It would depend on what you're

jhl

170

1          MR. O'CONNELL:  May I see that for a

2    second, please?  Thanks.

3          JUDGE GOVAN:  Let Mr. O'Connell see that.

4          [Pause.]

5          JUDGE GOVAN:  Thank you, counsel.

6          BY MS. MENDOZA:

7     Q    Do you have both copies of those forms?

8     A    Yes, ma'am.

9     Q    Isn't it correct that the copy which is

10    marked as Exhibit No. 3 for the employer differs

11    entirely from the other document?

12    A    The difference between the two is the one

13    that the employer had, has a calibration check

14    attached to it at the bottom of the form.

15    Q    The document that was given to Mr. Ramey

16    which would have been what you faxed to First Lab

17    should have been the same document shouldn't it?

18    A    Not necessarily.  The form that you just

19    gave me that does not have that at the bottom was

20    complete.  This other form that I attached to the

21    bottom of the employer's copy later was something I

22    did later on after the test was done.  It is not

jhl
171

1   part of the test, but at some point it has to be

2   done eventually because if it turns out you get a

3   reading that is out of calibration, that would have

4   negated this test narrative the instrument would

5   have been out of calibration.  So I just did it

6   later because at some point it has to be done.

7   Twice a month usually is when they're done.

8       Q    Would you look at Exhibit No. 1 and look

9   at the time that it states on that?  My copy says

10  it was August 30, 2003, at 11:59.

11      A    Correct, yeah.

12      Q    It wasn't done later, it was done

13  supposedly--

14      A    Well, it was done--it was--yeah, it was

15  done after I had given this to Mr. Ramey.  When I

16  was--completed his test and was finished performing

17  the test, I had given him his copy.

18      Q    Would you look at the second exhibit, I

19  guess it would be page 2 of Exhibit No. 1, it

20  states at the bottom of that page that you faxed

21  this complete form to First Lab.

22      A    Yes, I did, later in the day.  Yes.

jhl
177

 1          JUDGE GOVAN:  Mr. O'Connell, is there

 2     anything further?

 3                    REDIRECT EXAMINATION

 4          BY MR. O'CONNELL:

 5          Q    Just one point to clarify, please.

 6     Mr. Hyde, the difference between the form that I

 7     handed you and the form that Ms. Mendoza handed you

 8     is the presence or lack of presence of a

 9     calibration certification.  Is that right?

10          A    Correct.

11          Q    The purpose of the calibration is to make

12     sure the instrument is working properly?

13          A    It's to reinforce the fact that the

14     instrument was still within calibration at the

15     time.

16          Q    You simply do that by blowing in a gas

17     with a known alcohol content printed on the bottle?

18          A    Correct.

19          Q    And you compare it with the results of the

20     machine to make sure the machine is reading what

21     the bottle you just sprayed in there was, right?

22          A    Correct.

jhl

212

1    on his feet.  He was slurring his words.  And, yes,

2    his eyes were very, very bloodshot.

3         And so after observing this and just his--

4    his mannerisms, how he held his hands, how he--how

5    his body moved and what have you, I--and of course

6    the--the smelling of the alcohol, I determined that

7    he needed to be tested.  Because at that time we

8    were in a--in a storm condition, he was a truck

9    driver in conduit which meant that he would be

10   going out into the community.  He had to be at the

11   top of his senses because of the danger.  It's a

12   danger in and by itself if you're--you're in--

13   you're well tested and didn't have any alcohol in

14   your system.  So and we have had some fatalities at

15   PEPCO so we were very, very astute to the fact that

16   we wanted to keep a close watch on this.

17        Q    What was the purpose of ordering testing

18   for Mr. Ramey?

19        A    When--when Mr. Ramey is a commercial motor

20   vehicle driver, we are bound by the Department of

21   Transportation that if an individual reports to

22   work under the influence of alcohol or he's

jhl

213

1   observed at any time during his tour of duty, that

2   we are required to test him.  And the company also

3   has a policy if an employee reports to work under

4   the influence of drugs or alcohol, we also have to

5   test them.

6             We test them under what we call a

7   for cause test.  The DOT, we test them under the

8   provisions of the DOT testing.

9        Q    The for cause test is f-o-r, c-a-u-s-e?

10       A    F-o-r, c-a-u-s-e, yes.  For cause.

11       Q    Meaning that there is cause to order a

12   test?

13       A    Yes, there is cause to--for him to be

14   tested.

15       Q    Is the PEPCO policy dependent on DOT or

16   DOT dependent on PEPCO?

17       A    They are two separate entities and they

18   have--they have nothing to do with each other

19   except a test is given for drugs or alcohol in the

20   system.

21       Q    Is there a requirement under the DOT regs

22   that a test be administered within 8 hours of

jhl

214

1   observing an employee who warrants testing?

2       A    Yes.    That is exactly what happened in

3   this case.    Mr. Ramey came to work at quarter of--I

4   mean quarter to 12:00, 12 o'clock.    We had not got

5   him tested by 8 o'clock.    So at that point we could

6   no longer test him under the DOT policy, so we

7   tested him under the company policy for cause.

8       Q    Mr. Dudley, the union steward, was called,

9   correct?

10      A    Yes.

11      Q    He arrived at the office?

12      A    That is--that is a requirement of our

13  contract that whenever we talk to an employee and

14  there is a possibility that there might be

15  discipline involved, we have to have a union

16  steward available.

17      Q    Did Mr. Ramey ask you if he could go use

18  the rest room?

19      A    Yes.    When he first got there from Benning

20  with Mr. Johnson, he asked if he could go to the

21  rest room.    I basically asked him if he could hold

22  it and he said no, so I told him, no, he could not

Case No. 07-2340 (RJL)

# Exhibit B

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## Department of Employment Services
### Labor Standards Bureau

Office of Hearings and Adjudication
Administrative Hearings Division

★ ★ ★

(202) 671-2233-Voice
( 202) 673-6938-Fax

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| BENJAMIN RAMEY, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | OHA No. 05-318 |
| | ) | OWC No. 608087 |
| POTOMAC ELECTRIC POWER COMPANY, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CHC, | ) | |
| | ) | |
| Employer/Carrier. | ) | |

Appearances:

MARIA C. MENDOZA, ESQUIRE
For the Claimant

KEVIN J. O'CONNELLL, ESQUIRE
For the Employer/Carrier

Before:

AMELIA G. GOVAN
ADMINISTRATIVE LAW JUDGE

## COMPENSATION ORDER

### STATEMENT OF THE CASE

This proceeding arises out of a claim for workers' compensation benefits filed pursuant to the provisions of the District of Columbia Workers' Compensation Act of 1979, as amended, D.C. Code 2001, §§32-1501 *et seq.* (hereinafter, the "Act").

After timely notice, a full evidentiary hearing was held on August 17, 2005 before Amelia G.

Govan, Administrative Law Judge. Benjamin Ramey (hereinafter, claimant) appeared in person and by counsel. Potomac Electric Power Company[PEPCO]/CHC (hereinafter, employer) appeared by counsel. Claimant testified on his own behalf. Lamar L Dudley also testified on claimant's behalf. Gregory M. Johnson, Sr., Thomas Hyde, Negussie Birratu and David Duarte testified on behalf of employer. Claimant Exhibit (hereinafter, CX) Nos. 1 - 6 and Employer Exhibit (hereinafter, RX) Nos. 1 -

BENJAMIN RAMEY

10, described in the Hearing Transcript (hereinafter, HT) were admitted into evidence. The official record closed on September 16, 2005.[1]

## ISSUES

1. Whether there was an accidental injury on or about August 31, 2003 which arose out of and in the course of claimant's employment.[2]

2. Whether there was timely notice of the alleged work injury.

3. Whether the claim for benefits from the alleged work injury was timely filed.

4. The nature and extent of disability.[3]

## CLAIM FOR RELIEF

Claimant seeks an award under the Act for temporary total disability benefits from November 3, 2003 to the present and continuing, with interest, as well as causally related medical treatment.

---

[1]The record was held open to afford claimant an opportunity to file additional documentation on the issues of timely notice and timely claim. To date, the official record does not reflect filing of any post-hearing evidence.

[2]It is clear from review of the record in its entirety that the actual date alleged is August 30, 2003, the only date referred to in the formal hearing or deposition testimony and the only date which appears in contemporaneous documents record documents.

[3]Employer has raised the defenses of voluntary limitation of income, pursuant to D.C. Code, as amended, §32-1508(3)(V)(iii), and of failure to cooperate with vocational rehabilitation, pursuant to D.C. Code, as amended, §32-1507(d).

## BACKGROUND

Claimant worked as an conduit installer for employer for thirteen years. He allegedly sustained a post-traumatic stress injury on or about August 31, 2003 when he was accused of being intoxicated at work, constrained to ride with three co-workers to several Virginia medical facilities without being allowed to eat, drink, or use the restroom, then given a Breathalyzer and urine tests more than eleven hours after the starting time of his work shift.

Claimant was placed on a five day suspension because the Breathalyzer test results were positive. He returned to work on September 2, 2003, performing both full duties and overtime storm duties until September 30, 2003; that day, he was placed on Decision Making Leave and placed in a three year probationary status due to the events of August 30, 2003.

Claimant continued to work while participating in a mandatory alcohol rehabilitation program for three hours each evening. He was discharged from the program on October 27, 2003 for noncompliance. Claimant sought psychiatric treatment on November 3, 2003, and was diagnosed with post traumatic stress syndrome.

## FINDINGS OF FACT

The parties stipulated, and I find, claimant's employment is principally localized in the District of Columbia; there is an employer/employee relationship present pursuant to the Act; there have been no voluntary payments of compensation; and, the average weekly wage is $942.23.

Based upon the evidence of record, I find the following to be facts.

**BENJAMIN RAMEY**

As an initial matter, I found the testimony of Lamar Dudley, Gregory Johnson, Thomas Hyde and David Duarte to be credible regarding the significant factual matters in dispute.

However, I did not find claimant's testimony regarding the sequence of events and circumstances surrounding the alleged events of Labor Day weekend 2003 (from the time he reported to work until his departure the following morning) to be entirely credible. This determination is based upon inconsistencies between claimant's version of said events and the other record evidence, including witness testimony and documentary submissions. This finding does not suggest claimant deliberately attempted to mislead or prevaricate; it is based upon the belief of the undersigned that claimant's inebriated condition, on the morning in question, had a negative effect on claimant's comprehension, memory and/or perception of what actually occurred.[4]

In August of 2003 claimant, whose date of birth is May 6, 1950, was a conduit installer for employer. His work duties included building, installing, repairing, and maintaining employer's electrical system. Conduit installers who work overtime during storm duty are dispatched to unlit areas they may be unfamiliar with where live power lines and trees are down. His direct supervisor was Gregory M. Johnson, Sr.

At about 11:45 p.m. on August 29, 2003, claimant reported to work at employer's

Benning Road site in the District of Columbia, on overtime storm duty. Earlier that evening, between 5:00 and 7:00 p.m., claimant drank some beer. When he arrived at the work site, claimant got permission from Mr. Johnson to go get cigarettes, returned to the work site and sat in his car in the parking lot. About 3:00 a.m., a co-worker told claimant Mr. Johnson wanted to see him. Mr. Johnson's reason for summoning claimant was so that he could drive a CDL vehicle, weighing 13 tons, to a job assignment.

Claimant's faculties were impaired by alcohol when he was at work during the early morning hours of August 30, 2003.

When claimant reported to Mr. Johnson's office, the supervisor told him he smelled alcohol on his breath, accused claimant of drinking, made a telephone call, and told him to sit there. Mr. Johnson had difficulty conversing with claimant due to his extremely slurred speech which was repetitive, nonsensical and virtually inaudible. He observed claimant's eyes, which were bloodshot, and that claimant appeared to be unsteady on his feet.

About an hour later another supervisor, David Duarte, arrived. Mr. Duarte observed claimant to be reeking of alcohol, unsteady on his feet, to have bloodshot eyes and slurred speech. He chastised claimant loudly for being intoxicated, announced that he was going to give claimant a Breathalyzer test, then directed Mr. Johnson to bring claimant and meet him at employer's downtown office.

When Mr. Johnson, Mr. Duarte and claimant reconvened in Mr. Duarte's downtown office, Mr. Duarte directed claimant to sit in a chair in the corner of his office. Claimant asked to be excused to use the restroom and Mr. Duarte told

---

[4]Claimant reported to work at 12:00 am on August 30, 2003. More than eleven hours later, at 11:32 a.m., claimant's level of intoxication, as measured by a breath alcohol concentration test, was 0.065%. The U.S. Department of Transportation [DOT] requires removal from safety sensitive duties for up to 24 hours when results of this test are in the 0.02-0.039 range. (RX 1).

**BENJAMIN RAMEY**

him to "wait a minute". Shortly thereafter, Mr. Negussie Birratu, who was at that time a senior labor relations specialist for employer, came into Mr. Duarte's office. Again, claimant asked to use the restroom and Mr. Duarte told him to sit there and wait. Claimant also asked to go smoke a cigarette with Mr. Duarte and Mr. Johnson; Mr. Duarte refused him permission, telling him again to sit down.

During the extended time (about two hours) that claimant was sitting and waiting in Mr. Duarte's office, Mr. Duarte was making telephone calls to try to arrange for a Breathalyzer test. At some point, claimant asked Mr. Duarte why he was treating him like a dog or an animal, and Mr. Duarte did not respond.

A few minutes later, when claimant attempted to speak again, Mr. Duarte forcefully told him to "shut up". Later, Lamar L. Dudley, a union representative, also entered Mr. Duarte's office. Mr. Dudley introduced himself to claimant and explained why he was there. Shortly thereafter, everyone in the office was instructed to leave by Mr. Duarte. Claimant, Mr. Dudley, Mr. Johnson, and Mr. Negussie got into an automobile and left. When they drove off, it was after 5:00 a.m., and it was not dark. Claimant rode in the back seat with Mr. Dudley; Mr. Johnson drove, and Mr. Negussie rode in the front passenger seat.

The vehicle headed south and drove for about an hour; claimant observed a sign for Dulles Airport. At some point, the driver was lost, and stopped to ask for directions.

The group arrived at a facility where Mr. Negussie and Mr Dudley spoke with a physician; the group was at this facility for about an hour. Claimant asked Mr. Negussie if he could use the restroom, and was refused. Mr.

Dudley asked both Mr. Negussie and Mr. Johnson to give claimant something to eat or drink, and was refused.

The group drove around for some time before reaching another facility, where they stopped. Mr. Dudley and Mr. Negussie went to the back to speak with the physician there; claimant asked Mr. Johnson again for something to eat, and was refused. The physician at the second facility came out into the waiting room and advised the group that they couldn't get the Breathalyzer test done there. At about 8:30 a.m., Mr. Dudley insisted that claimant be allowed to use the restroom. Claimant did so, thanked Mr. Dudley when he came out, and was given a drink of water.

The group left that facility and returned to employer's downtown building. The others in the group purchased donuts and coffee, but refused claimant anything to eat or drink. The group returned to Mr. Duarte's office, and Thomas Hyde, a Breathalyzer technician arrived about 11:00 a.m. Although Mr. Hyde stated that they had waited too long, at Mr. Duarte's direction claimant was tested. On August 30, 2003 at 11:32 a.m., two successive Breathalyzer tests were administered to claimant. Both tests had positive results; the first reading was 0.070, and the second reading was 0.065. (CX 6).

Claimant, Mr. Duarte and a security officer next went to claimant's automobile, which Mr. Duarte directed the officer to "shake down". Security inspected claimant's car trunk, inside the passenger compartment, and under the seat. Mr. Duarte told claimant he had been placed on five days crisis suspension, and left. Claimant got in his car, drove home, and went to bed.

Claimant was placed on suspension effective September 1, 2003. Mr Dudley sent a report

describing the August 30, 2003 incident to the union local; one week later, the union local filed a grievance on claimant's behalf. Claimant returned to work on September 2, 2003; he performed his usual duties as a conduit installer and also worked on overtime storm duty. He performed his job duties with no apparent problems or unusual behavior.

On September 10, 2003, claimant was re-tested, with negative results. However, on September 30, 2003 he was placed on "Decision Making Leave"["DML"], which required participation in a program for alcohol rehabilitation. The DML also placed claimant on drug and alcohol probation for three years and provided for random drug and alcohol testing during the first two years of the probation. Claimant was told that successful completion of the alcohol rehabilitation program was a condition of continued employment, and that failure to complete the program would result in his termination.

Beginning in mid-October of 2003, claimant participated in a rehabilitation program for two weeks; taking Antabuse medication was a requirement of the program. Although drinking alcohol was prohibited by the rehabilitation program, claimant continued to drink beer, at home, while he was enrolled in the program. Claimant was terminated from the rehabilitation program on October 27, 2003.

On October 28, 2003, while exercising at home, claimant felt upper extremity numbness and tingling. He sought emergency medical attention at Howard University Hospital, where he was seen, prescribed medication, and released. In early November of 2003 claimant sought psychiatric treatment.

Claimant did not return to work; he was on sick

leave from November 3, 2003 until 26 weeks later (in or about February of 2004) when his sick leave ran out; he received about three months of unemployment benefits as well. Thereafter, claimant was terminated by employer.[5]

There is no record documentary evidence to indicate claimant filed an Employee's Notice of Accidental Injury or a claim application related to the alleged August 31, 2003 injury, with the District of Columbia Office of Workers' Compensation ["OWC"].

An Employer's First Report of Injury or Occupational Disease, reflecting a post traumatic stress (mental) injury beginning November 3, 2003, was filed with the District of Columbia Office of Workers' Compensation on January 28, 2004.[6]

## DISCUSSION

The arguments of both parties on the issues presented for resolution were given equal consideration. To the extent an argument is consistent with my findings and conclusions, it is accepted; to the extent an argument is inconsistent, it is rejected.

Claimant's position is that he sustained a compensable emotional injury, post traumatic stress disorder, as a result of employer's actions on Labor Day weekend of 2003 (on or about

---

[5]Claimant testified, at his August 3, 2005 deposition and at the August 17, 2005 formal hearing, that he was terminated effective November of 2004.

[6]The typed portions of this form indicates it was completed by a Sharon Rosado and submitted by a Jonnetta Gross, whose official position is Senior Claims Examiner. However, claimant's signature appears on the signature line under Ms. Gross' typed name. (EX 1).

Case No. 07-2340 (RJL)

# Exhibit C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BENJAMIN RAMEY,            )
                                    )
             Plaintiff,    )
                                    )
v.                             )     Case No. 1:04CV02088 (RJL)
                                    )
POTOMAC ELECTRIC POWER   )
COMPANY, et al.,            )
                                    )
             Defendants.   )

## DECLARATION OF EILEEN APPUGLIES

I, Eileen Appuglies, do hereby depose and swear as follows:

1.      I am over the age of eighteen (18) and am otherwise competent to make this Declaration. The information contained in this Declaration is based on my personal knowledge.

2.      I am currently employed by Potomac Electric Power Company ("Pepco") as a Manager, Human Resources Business Partner. In this capacity, I am responsible for managing human resource functions, such as staffing, compensation, benefits, and employee relations, for Pepco.

3.      Attached as Exhibit A to this Declaration is a true and accurate copy of relevant portions of the January 24, 1999 collective bargaining agreement ("CBA") between Pepco and Local Union 1900 of the International Brotherhood or Electrical Workers.

4.      Attached as Exhibit B to this Declaration is a true and accurate copy of Pepco's Drug and Alcohol Policy.

5.    Attached as Exhibit C to this Declaration is a true and accurate copy of the December 11, 1996 Agreement between Pepco and Local 1900.

6.    Disputes concerning the Drug and Alcohol Policy which involve bargaining unit employees, are resolved pursuant to the grievance and arbitration provisions of the CBA.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me is willingly false, I am subject to punishment.

Eileen Appuglies

# EXHIBIT A

# CONTENTS

| | | Page Number |
|---|---|---|
| Preamble | .................................................. | 1 |
| Article 1 | Management .......................................... | 1 |
| Article 2 | Bargaining Unit ..................................... | 1 |
| Article 3 | Union Membership and Dues. | |
| | Deduction ........................................... | 2 |
| Article 4 | Union Business ...................................... | 4 |
| Article 5 | Pay Progression, Work Assignments and Job | |
| | Classifications ..................................... | 5 |
| Article 6 | Special Premiums ................................... | 10 |
| Article 7 | Overtime ............................................ | 13 |
| Article 8 | Seniority ........................................... | 18 |
| Article 9 | Reduction in Working Forces ........................ | 22 |
| Article 10 | General Provisions ................................ | 24 |
| Article 11 | Holidays .......................................... | 25 |
| Article 12 | Vacations ......................................... | 26 |
| Article 13 | Sickness Disability Allowances .................... | 29 |
| Article 14 | Leave of Absence .................................. | 33 |
| Article 15 | Limited Services .................................. | 36 |
| Article 16 | Suspension and Discharge .......................... | 37 |
| Article 17 | Grievance Procedure ............................... | 38 |
| Article 18 | Arbitration ....................................... | 40 |
| Article 19 | Application Laws and Regulations .................. | 41 |
| Article 20 | Safety and Health ................................. | 41 |
| Article 21 | Unauthorized Work Stoppages, Slowdown, or | |
| | Lockouts .......................................... | 42 |
| Article 22 | Benefit Plans ..................................... | 42 |
| Article 23 | Identify of Parties and Complete Agreement ........ | 45 |
| Article 24 | Duration, Reopening and Renewal ................... | 45 |

i

## PREAMBLE

THIS COLLECTIVE BARGAINING AGREEMENT IS MADE BY AND BETWEEN POTOMAC ELECTRIC POWER COMPANY (HEREINAFTER REFERRED TO AS THE "COMPANY") AND LOCAL UNION #1900 OF THE INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS (HEREINAFTER REFERRED TO AS THE "UNION").  THE PARTIES DO HEREBY AGREE AS FOLLOWS:

### ARTICLE 1

### MANAGEMENT

**Section 1.01.**  By reason of the nature of the business of the Company it is essential, and is therefore agreed, that the management of the Company, the supervision and control of all operations and the direction of the working forces, including, but not limited to, the right to hire, suspend, furlough, discipline, discharge for cause, promote, demote, or transfer employees, and the right to operate the Company, shall be vested in, and reserved to, the Company, except as herein limited.

### ARTICLE 2

### BARGAINING UNIT

**Section 2.01.**  The Union is recognized as the sole collective bargaining agent for the bargaining unit, which is composed of all employees of the Company at all work locations, regardless of the method of pay, excluding only confidential employees, property protection employees (guards), and professional, supervisory and management employees.

**Section 2.02.**  Regular employees are employees whose employment is reasonably expected to be permanent at the time they are employed, and it is contemplated that they will work in each calendar week a normal workweek.

**Section 2.03.**  Temporary employees are employees whose employment is with the definite understanding that the employment is not of a permanent nature, but it is contemplated that they will work a normal workweek while employed. The Company will inform the Union of the employment and assigned Department of such employees and the expected duration of their employment.

**Section 2.04.**  Whenever the terms "employee" or "employees" are used in this Agreement, they shall refer only to employees in the bargaining unit as identified herein unless specifically stated otherwise.

**Section 2.05.**  Casual employees are employees who are employed to work part-time of less than a normal workday or a normal workweek. They may be assigned to bargaining unit work but are not in the bargaining unit or subject to this Agreement.  These employees will not in any instance deprive qualified regular employees of overtime work. The Company will inform the Union of the employment and assigned Departments of such employees.

**Section 2.06.**  Any existing bargaining unit job moved from bargaining unit to non-bargaining unit will be negotiated with the Union by the Company.

**Section 2.07.**  The Union and the Company shall keep each other informed as to the individuals authorized to act in Union-Management relationships.

1

determined by the Company's Medical Director, he/she shall be returned to the job in question. Concerning a job in a higher classification or a job in another Occupational Group, if the employee is found to be capable of performing the duties of such job as determined by the Medical Director, the employee shall be given consideration on the next job vacancy.

## ARTICLE 16

## SUSPENSION AND DISCHARGE

**Section 16.01.** The maintenance of discipline is the responsibility of the Company and to that end the Company may discipline employees for cause. A copy of all disciplinary actions issued to Bargaining Unit employees will be forwarded to the Union. This includes all Oral Reminders, Written Reminders, Decision Making Leaves (DML), and notices of meetings regarding continuation of employment (and resulting determinations from such meetings).

**Section 16.02.** In the event the Company believes that a Bargaining Unit employee's problems regarding work performance, conduct & safety, or attendance appears to warrant discharge, a meeting will be scheduled for that employee before his/her General Manager (or designated representative); other Company representatives may also be present.

(a)     The employee and the Union will be notified, in writing, at least two (2) days prior to the meeting. The notification will include the date and time of the meeting, a statement describing the employee's performance problem(s), and a statement to the employee advising of his/her right to Union representation (also included will be the Union's telephone number).

(b)     The Company will endeavor to assure that a Union Steward is available when an employee is notified of the meeting. In the event a Steward is not available, the Union office will be notified as soon as reasonably possible.

(c)     The purpose of the meeting is to assure that an appropriate decision is made regarding the Bargaining Unit employee's continued employment with the Company. A representative of the Union may attend that meeting. If desired, the employee may allow that Union official to represent him/her at that meeting. During this meeting, all parties will make all relevant facts available. Further, the Company may allow witnesses with relevant information to testify at the meeting.

(d)     After the meeting, and after the Company has completed any additional investigation that it deems appropriate, the employee will be advised, in writing, of the Company's final determination. A copy of that determination will be forwarded to the Union. It is understood that employees will remain at work pending the Company's final determination, unless that employee has been placed on Crisis Suspension or Excused With Pay.

**Section 16.03.** In the event a Bargaining Unit employee is placed on Crisis Suspension or Decision-Making Leave, the Company will endeavor to assure that a Steward is present when the employee is notified. In the event a Steward is not available, or it is impractical to have a Steward present, the management representative who places the employee on Crisis Suspension or Decision-Making Leave is responsible for ensuring that the Union office is notified as soon as possible. Additionally, the employee will be provided with the Union's telephone number.

(a)     It is understood and agreed that a Crisis Suspension does not necessitate a meeting before the employee's General Manager (or designated Representative) unless that suspension is expected

to be converted to discharge. However, in the event a Crisis Suspension extends past five (5) days, the Union shall have the right to request a hearing. In the event of such request, the parties shall, within two (2) days, arrange to meet and discuss the employee's employment status.

Section 16.04. In the event the Union disagrees with a Company decision to discharge a Bargaining Unit employee, the Union may, within five (5) working days after the determination, appeal the discharge directly to Arbitration in accordance with Article 18. However, prior to Arbitration, the Union may request that a Step 2 meeting be held to discuss the matter.

Section 16.05. Crisis Suspensions may be appealed directly to Step 2 of the Grievance Procedure, Article 17.


# ARTICLE 17

## GRIEVANCE PROCEDURE

Section 17.01. It is considered by the parties that all grievances should be presented promptly, discussed without delay and answered within a reasonable time. A grievance is defined as a violation of a specific term(s) or provision(s) of this Agreement or of an established precedent in terms and/or conditions of employment. It is also considered that grievances should be settled whenever possible at the levels where the greatest familiarity with the subject matter exists. Any individual employee or group of employees shall have the right to present grievances and to have them considered for adjustment, provided any adjustments are not inconsistent with the terms of this Agreement and a Union representative has been given an opportunity to attend as provided in this procedure. Therefore, it is agreed that all grievances shall be subject to the following grievance procedure.

Section 17.02. Any employee who believes that he/she has a grievance shall, within one (1) week after the cause of the grievance is alleged or known to have taken place, discuss it with his/her immediate supervisor. The employee may, if he/she desires, have his/her Steward present during the discussion. The supervisor shall within three (3) workdays after the discussion, notify the employee or Steward (if present at the discussion) of his/her disposition of the matter.

Section 17.03. Step 1—If the appropriate supervisor's response does not resolve the grievance, then within two (2) weeks after the cause for the grievance is alleged or known to have taken place, the grievance shall be stated in writing on forms available from the Company or the Union, listing facts, reasons, Agreement provisions in question, and/or established precedent in terms and conditions of employment. The grievance must be numbered (by the Local Union Office), dated and signed and one (1) copy shall be delivered to the Department Head and one (1) copy shall be delivered to Employee Relations and Communications Center. If a grievance is not delivered to the Department Head within two (2) weeks after occurrence of cause for the grievance, it will no longer exist.

Section 17.04. Within one (1) week of delivery of the aforesaid grievance to the Department Head, the appropriate supervisor(s), the grievant, Steward, and/or Chief Steward shall meet to resolve the grievance. Within one (1) week after the meeting, the appropriate supervisor(s) shall give written notice to the Steward, with a copy to the Local Union President, of the determination of the grievance. If the grievance is not resolved, it may be taken to Step 2.

Section 17.05. Step 2—If the grievance is not resolved in Step 1, the President of the Local Union (or his/her designated representative) may, within two (2) weeks after receipt of the written determination in

38

Step 1. Submit in writing to the Manager - Employee Relations and Communications Center (or his/her designated representative) a request for a meeting to resolve the grievance. Within one (1) week after receipt of such request from the Local Union President (or his/her designated representative), the Manager - Employee Relations and Communications Center (or his/her designated representative) shall arrange to meet with the Union's Grievance Committee (grievant, Steward, Chief Steward, and/or Local Union President or his/her designated representative) to resolve the grievance. Such meeting will be held within four (4) weeks of the receipt of the request unless mutually agreed otherwise. The Union and the Company may have present and eligible to participate in the discussion any persons they so desire. Within two (2) weeks after the meeting, the Manager - Employee Relations and Communications Center (or his/her designated representative) shall give written notice to the Local Union President (or his/her designated representative) of the determination of the grievance. If the grievance is not resolved in Step 2, it may be taken to arbitration as provided in Article 18.

**Section 17.06.** Discussions regarding grievances shall be conducted as far as practicable during the employee's working hours. Payment for discussions regarding grievances shall be compensated as outlined in Article 4 of this Agreement. All employees shall first obtain permission from their supervisor to be absent for such meetings and must report to him/her upon returning.

**Section 17.07.** Grievances relating to matters which extend beyond a single Department, Division, or Group may originate in the Step of the grievance procedure where management authority to settle the matter exists, but no grievance may be taken to arbitration until it has been presented in Step 2, except where time limits as described in Section 17.05 have been exceeded and then only if the party seeking to move the matter to arbitration has not caused or contributed to the time limits being exceeded or except as otherwise provided for in Section 18.05 regarding discharges.

**Section 17.08.** Whenever a grievance involves a group of employees, a committee of not more than three persons, which shall include the appropriate Steward and at least one of the employees affected, may be substituted for an employee wherever the word "employee" is used in the grievance procedure.

**Section 17.09.** It is agreed that the grievance procedure or time limits may be varied at anytime by agreement of the parties when such action appears to be necessary or desirable.

**Section 17.10.** The Union and the Company shall inform each other of persons authorized to represent them in grievance matters.

**Section 17.11.** Grievances of the Company or Union shall originate in the lowest step where authority to take appropriate action exists.

**Section 17.12.** The grievance procedure is applicable to all employees in the bargaining unit except as otherwise restricted elsewhere in this Agreement, provided, however, that terminations of regular employees during their first year of continuous service and terminations of temporary employees at anytime may not be the subject of a grievance.

**Section 17.13.** Failure to comply with the time limit provisions by employees or Union representatives shall invalidate the grievance. Failure to comply with the time limit provisions by Management representatives shall permit the grievance to be advanced to the next Step of the grievance procedure.

39

## ARTICLE 18.

## ARBITRATION

**Section 18.01.** Any grievance not resolved in Step 2 of the grievance procedure may be submitted to impartial arbitration.

**Section 18.02.** The Company or the Union shall notify the other party of its desire to proceed to arbitration within two (2) weeks of receipt of the Step 2 answer. Such notice shall be in writing and shall specify the grievance to be arbitrated and state the issue(s) involved.

**Section 18.03.** An impartial Arbitrator shall be selected by mutual consent of the Company and the Union as soon as practicable after receipt of the request for arbitration. If the parties do not agree on the selection of an Arbitrator within two (2) weeks after receipt of the request for arbitration, the American Arbitration Association shall select from a standing panel (agreed to by the parties in the Memorandum of Understanding by which this Agreement was established) the five Arbitrators least recently selected under this Article and shall provide a list thereof to each party. Within one (1) week following receipt of the list of Arbitrators, the parties shall meet and alternate in striking names from the list with the loser of a coin toss striking first. The remaining name, after each party has struck twice, shall be the impartial Arbitrator.

**Section 18.04.** The arbitration hearing shall be held as quickly as possible. The award of the Arbitrator shall be final and binding upon both parties and upon the employee(s) involved. The fees and expenses of the Arbitrator, and any other expenses agreed to by the parties prior to the arbitration hearing, shall be shared equally by the Company and the Union. The Arbitrator shall have power and authority to arbitrate only those matters expressly made subject to arbitration by the terms of this Agreement and shall rule only on the issues submitted to him/her. The Arbitrator shall have power only to interpret this Agreement and shall not have the power to alter or amend it.

**Section 18.05.** At the request of either party, a grievance involving the discharge or discipline of an employee shall be submitted to Expedited Arbitration (as defined below). The Arbitrator for such Expedited Arbitrations shall be appointed from a standing panel of at least ten (10) Arbitrators agreed to by the parties in the Memorandum of Understanding by which this Agreement was established. As soon as practicable after receipt of the arbitration request referred to in Section 18.02 above, the parties shall try to agree on a date(s) to arbitrate the case. If agreement is reached, the parties shall notify the American Arbitration Association (hereinafter "AAA") of the desired date(s). The AAA will then appoint an Arbitrator from the parties' standing panel who is available on the requested date(s). Prior to the parties' selection of a mutually acceptable date(s), neither party shall be informed of the availability of a named Arbitrator on a particular date. If the parties are unable to agree on a date within two (2) weeks after receipt of the request for arbitration, either party may so notify the AAA, requesting that the AAA appoint an Arbitrator who will set the time and date(s) after considering the parties' positions on when the case should be heard. In appointing Arbitrators under this Section, the AAA shall make every effort to evenly distribute the cases among the standing panel of Arbitrators. The Expedited Arbitration will be conducted according to the Expedited Arbitration rules in effect July 1, 1983, except to the extent inconsistent with this Section.

40

# 1999 General Memorandum of Understanding

Whereas, the Potomac Electric Power Company (the "Company" or "Pepco") and Local 1900 of the International Brotherhood of Electrical Workers (the "Union") by mutual agreement conducted early negotiations to establish a successor Collective Bargaining Agreement to the 1996 Collective Bargaining Agreement and,

Whereas, the Company and the Union have agreed to a successor Collective Bargaining Agreement (hereinafter referred to as the "Agreement" or "CBA"), whose terms are set forth below;

It is, therefore, further agreed and understood between the Company and Union that:

I.     Contract Duration

The 1999 Agreement shall be effective upon ratification except as provided otherwise in this Agreement. The term of this Agreement shall be to and including May 31, 2003 and it shall thereafter continue in full force and effect for succeeding periods of 12 calendar months each, unless either party, prior to April 1, 2003, or April 1 of any year thereafter, shall serve written notice upon the other party of its desire to amend and/or terminate the Agreement as of the following June 1. The Contract shall read as set forth in the 1993 Collective Bargaining Agreement except to the extent modified herein or modified through other written agreements between the parties. The Annex shall be modified consistent with written agreements between the parties since the signing of the 1993 Collective Bargaining Agreement.

II.    General Wage Increases

A.    The Company shall provide a general wage increases (GWI) of 3% in 1999, 3% in 2000, and 3% in 2001 to eligible employees. In 2002, there will also be a 3% increase unless either party, for any reason, provides 60-days notice prior to June 1, 2002 of its intention to reopen the contract. Any such reopener will be limited to wages and benefits. If no agreement is reached regarding wages and benefits by June 1, 2002, either party may terminate the agreement at any time by giving 48 hours written notice thereof to the other party.

B.    The 1999 increase shall be effective as soon as practicable after ratification. If the Agreement is ratified in December 1998, the Company shall endeavor to place the GWI in effect by the payroll period beginning February 14, 1999. The Company further agrees that if the Agreement is ratified in December 1998, each employee employed in the bargaining unit from January 3, 1999, to the beginning of payroll period in which the 1999

# EXHIBIT B

# HUMAN RESOURCES
# CORPORATE PERSONNEL POLICIES

*Kamey*

### Click Below To Return

Corporate Personnel Policies All | Corporate Personnel Policies Recent Changes

| | |
|---|---|
| Policy Section: | 80: Personnel - General |
| Policy Title: | Drug and Alcohol |
| Policy Number: | 80.200 |
| Effective Date: | 12/23/1999 |
| Issued Date: | 03/01/2000 |
| Supersedes Policy: | Corporate Personnel Policy No. 80.200 dated 1/1/95 |

## ▼ Policy Information:

## PURPOSE

The purpose of this policy is to establish and maintain a safe workplace and a healthy and efficient workforce free from the effects of substance abuse.

## GENERAL

A copy of this Corporate Personnel Policy No. 80.200, Drug and Alcohol, should be posted in a conspicuous place in each department and each employee should receive a copy of this Policy.

## INTRODUCTION

The Company is firmly committed to providing a safe workplace and promoting high standards of employee safety and health. Employee involvement with drugs or alcohol, on or off the job, can take its toll in the workplace by increasing absenteeism, by lowering productivity and morale, by undermining public confidence in the Company, and most importantly, by undermining the safety of employees and the public. The use or possession of illegal drugs is particularly unacceptable because, among other things, it involves criminal activity under state and federal laws. A comprehensive policy concerning drugs and alcohol is necessary to ensure that the Company continues to fulfill its special responsibility to provide energy in a safe, economical and reliable manner, and to ensure that employees are made aware of the Company's rules in this area.

## Employee Advisory Service

Early identification and treatment of a substance abuse problem is the best method for protecting the interests of all concerned. Since 1976, the Company has provided an avenue for seeking professional assistance to deal with such problems: the Employee Advisory Service.

Pepco's Employee Advisory Service is available to any employee who needs counseling or assistance in dealing with a drug or alcohol problem. Ultimately, however, it is the employee's responsibility to take the first step. While Pepco encourages voluntary participation in the Employee Advisory Service, such participation will not prevent, or lessen the extent of disciplinary action for violations of the rules set

forth in this or any other policy.

## STANDARDS REGARDING DRUGS AND ALCOHOL

The following minimum action shall occur where an employee has not lived up to the standards set forth below. More severe discipline, however, may be necessary where circumstances warrant it. For instance, if while unfit for duty, an employee is involved in an accident, altercation, or otherwise causes damage to person or property, more severe discipline may be imposed. Previous violations of this or other policies or rules will be considered in determining appropriate discipline and may result in more severe discipline.

### Alcohol Standards

### Use, Possession, Distribution

Employees must not bring alcohol onto Company property or places where they are on duty at any time. An employee who uses, possesses, or distributes alcohol while on duty or on Company property will be subject to appropriate discipline (from Written Reminder to Termination), depending on the circumstances involved.

### Fitness for Duty/Alcohol in System

Employees must report to work and while on duty or on Company property must remain in a condition to perform their duties safely and with maximum efficiency.

- An employee in any job classification may not have a blood-alcohol concentration of 0.05% or more (or have a concentration equal to, or in excess of, a corresponding level as determined by a different diagnostic test such as a Breathalyzer) while on duty or on Company property. An employee found to have a to have a blood-alcohol concentration of less than 0.05% (or its equivalent) shall be considered in violation of this standard where it can be determined based on accepted medical ranges that the employee had a concentration of 0.05% or more (or its equivalent) while on duty or on Company property. In either of these circumstances, the employee shall be placed on Decision-Making Leave (DML).

- An employee in a job classification requiring a Commercial Motor Vehicle driver's license may not have a blood-alcohol concentration of 0.02% or more while on duty or on Company property. An employee who has a blood-alcohol concentration of 0.02% but less than 0.04% (or has a concentration equal to, or in excess of, a corresponding level as determined by a different diagnostic test such as a Breathalyzer) while on duty or on Company property shall be considered in violation of this standard and shall be given an Oral Reminder. In such cases, the employee is unable to work for 24 hours pursuant to federal regulations and shall be placed on crisis suspension absent other arrangements.

- An employee in a job classification requiring a Commercial Motor Vehicle driver's license who has a blood-alcohol concentration of .04% but less than 0.05% (or has a concentration equal to, or in excess of, a corresponding level as determined by a different diagnostic test such as a Breathalyzer) while on duty or on Company property shall be considered in violation of this standard and shall be given a Written Reminder. In such cases, the employee will be unable to work until certain conditions are met pursuant to federal regulations and shall be placed on crisis suspension. The employee must see a medical health care professional recommended by the Company and must follow his/her recommendations before the employee can return to duty. In

addition, the employee must pass a return-to-work alcohol test. During the next 12 months, the employee will be required to submit to at least 6 random tests for alcohol.

- An employee in a job classification requiring a Commercial Motor Vehicle driver's license who has a blood-alcohol concentration of 0.05% or greater (or has a concentration equal to, or in excess of, a corresponding level as determined by a different diagnostic test such as a Breathalyzer) while on duty or on Company property shall be considered in violation of this standard and shall be placed on crisis suspension until certain conditions are met pursuant to federal regulations. The employee must see a medical health care professional and must follow his/her recommendations before the employee can return to duty. In addition, the employee must pass a return-to-work alcohol test and will be subject to 2 years of drug and alcohol testing as set forth in the paragraph below

- An employee who tests positive in violation of any of the standards described above shall initially be placed on crisis suspension until the Company completes its investigation of the matter which normally involves obtaining test results. If as a result of that investigation the Company determines that the employee violated the standards set forth above, the employee will be disciplined accordingly. An employee testing positive in violation of this policy shall not be paid for any time missed due to crisis suspension. Notwithstanding the deactivation periods for disciplinary actions set forth in the Positive Discipline Policy, Pol. No. 30.100, any employee who violates this policy and is not discharged shall be placed on drug/alcohol policy probation for three (3) years and shall be subject to periodic, unannounced drug and alcohol testing during the first two (2) years of probation. If the employee violates any rules set forth in this policy during his or her probationary period, he/she shall be discharged. In addition, consistent with the Positive Discipline Policy, if an employee receives Decision-Making Leave (DML) for violating the Drug & Alcohol Policy, discharge will occur if any performance problem (work performance, conduct & safety or attendance) warranting formal discipline takes place during the 18-month period the DML is active.

## Drug Standard

## Purchase, Sale, Use, Possession, Distribution

Except in cases involving properly prescribed medication, employees may not bring drugs onto Company property or places where they are on duty at any time. An employee who buys, sells, uses, possesses, or distributes drugs while on duty or on Company property shall be discharged on the first occurrence. Illegal substances will be confiscated and turned over to the appropriate law enforcement agency. The law enforcement agency will also be informed of the circumstances under which the drugs were seized and the identity of the individuals involved.

## Drugs in System

The well-known hazards associated with the use of drugs, together with Pepco's policy of providing a safe workplace and a healthy and efficient workforce that is free from the effects of substance abuse, require a policy designed to ensure a drug-free environment. Accordingly, it is the Company's policy that, except for properly prescribed medication, employees may not be at work or on Company property with drugs (or drug metabolites) in their system – regardless of when and where the drugs were taken. Employees should be aware that drugs (or drug metabolites) are present and detectable in the human body for a substantial period of time after each use.

When there is a triggering event or a reason to believe drugs may have been used or in other circumstances necessitating testing, the Company will use diagnostic tests, including blood and/or urine tests, to detect drugs or drug metabolites in an employee's system. When time and circumstances permit, this process may involve a preliminary urine screen. The urine samples collected will also be sent to an independent laboratory for further analysis. If the preliminary urine screen shows the presence of marijuana (or its metabolites), a blood sample will be drawn. This sample will also be sent to the independent laboratory for analysis.

If any such test reveals drugs (or drug metabolites) in an employee's system, the employee will be subject to disciplinary action as set forth below:

- **Heroin, Cocaine, Morphine, PCP an Hallucinogens**

  An employee found to have any detectable concentrations of heroin, cocaine, morphine, phencyclidine (PCP), or hallucinogens (or metabolites of any such drugs) in his or her system shall be discharged on the first occurrence.

- **Other Drugs**

  An employee found to have any detectable concentrations of marijuana in his or her system, as established by a blood test, shall be discharged on the first occurrence.

  o Where a blood test is not conducted for marijuana or where such a test is conducted but is negative, an employee found to have any detectable concentrations of marijuana (or its metabolites) in his or her system as established by a test other than a blood test (for instance, by urinalysis) or an employee found to have any detectable concentrations of any other illegal drug or drug metabolites (except those listed above) in his or her system as established by any test shall be disciplined as follows:

  o Where there is corroborating evidence that the employee was unfit for duty, the employee shall b discharged on the first occurrence.

  o Where there is no corroborating evidence that employee was unfit for duty, the employee shall be placed on (or continued on) crisis suspension pending further investigation. The employee will be retested five (5) working days from the date of the test. Depending on the results of the test, the following action will be taken:

  o If the employee tests negative for all drugs or drug metabolites, he/she shall be placed on Decision-Making Leave and shall receive no back-pay for time missed due to crisis suspension; or

  o If the employee tests positive for any drug or drug metabolites, he/she shall be discharged except in circumstances set forth in the paragraph immediately below; or

  o If the employee tests positive for marijuana (and negative for other drugs), the Company will determine whether, based on the concentrations detected, there is sufficient evidence that the employee has consumed marijuana since his/her initial test. If the Company determines that there is sufficient evidence of such consumption, the employee shall be discharged. If the Company determines there is insufficient evidence of such consumption since the initial test, the employee shall be continued on crisis suspension and subject to

retesting in another five (5) working days. Assuming the employee ultimately returned to work, he or she shall receive no back pay for time spent on crisis suspension.

An employee who is returned to work under this section shall be placed on Decision-Making Leave (Code 64). Upon his/her return, the employee shall meet with his/her supervisor to discuss the employee's commitment to follow Pepco's standards. Additionally, an employee who is returned to work under this section shall be placed on probation for three (3) years and shall be subject periodic, unannounced drug and alcohol testing during the first two (2) years of probation. If the employee fails to meet any of the standards set forth in this policy during his or her probationary period, he/she shall be discharged. In addition, the Decision-Making Leave shall remain active for 18 months, consistent with the Positive Discipline Policy.

## Other Rules

### Testing

Employees will be required to submit to blood, urine, breathalyzer or other diagnostic tests to detect alcohol and/or drugs (or drug metabolites) in their system under any of the following circumstances:

- When there is a triggering event or a reason to believe drugs or alcohol may have been used;

- When an employee is subject to periodic, unannounced testing in the following circumstances:

- During his/her first year of continuous service with the Company;

- When such testing is required under local or federal legislation, regulation or administrative rule;

- During the first two years following any infraction of this policy that causes an employee to be placed on Decision-Making Leave.

- At any other time required under local or federal legislation, regulation or administrative rules.

An employee who refuses to submit to any such test or adulterates or substitutes a specimen during the test shall be discharged on the first occurrence.

Employees suspected of violating the standards set forth in this policy who are tested may be placed on crisis suspension pending completion of the Company's investigation. If test results establish a violation of the standards of this policy, appropriate disciplinary action will be taken. In no case where such a violation has been established will the employee be paid for time missed due to crisis suspension.

### Searches

Under this policy, the Company will conduct searches for drugs or alcohol when there is a triggering event or when the Company has a reasonable belief that a search would reveal prohibited items. Searches will be conducted in a manner that provides employees with as much privacy as possible, consistent with the circumstances involved. An employee who refuses to submit immediately to a search of his or her person, vehicle or other property shall be discharged on the first occurrence. Employees are

reminded that under this policy, employee lockers, desks, tool boxes, etc., are subject to search for drugs and alcohol and refusal to cooperate fully with such a search would also result in discharge on the first occurrence.

## Drug Paraphernalia

Employees are prohibited from bringing drug paraphernalia onto Company property or places where they are on duty at any time. An employee who possesses or distributes such paraphernalia while on duty or on Company property is subject to discharge on the first occurrence.

## Off-Duty Arrests/Convictions

An employee who is arrested for, or convicted of (including a guilty plea or plea of 'Nolo Contendere'), a drug offense which involves the off-duty or on-duty sale, distribution, or possession with intention to distribute illegal drugs, or manufacture them must inform the Company as soon as possible of his/her arrest, the nature of the charges, and the ultimate disposition of the charges, including any conviction. It no case should such a report be made more than three (3) calendar days beyond the date of the triggering event. Failure to timely report such information to area management is grounds for discharge on the first occurrence. Assuming the information is timely provided, the Company's action (if any), disciplinary or otherwise, shall be based on consideration of the facts and circumstances involved.

## Reporting Use of Medications

Employees who take over-the-counter or prescribed medication must promptly report to appropriate personnel in the Medical Department the use of medication which they are aware is likely to impair their ability to do their job. An employee who fails to do so is subject to appropriate action (Coaching to Written Reminder), depending on the circumstances.

## Taking Medication Contrary to Instructions

Employees who take over-the-counter or prescribed medication contrary to instructions will be subject to appropriate action, from Written Reminder to Decision-Making Leave, if such action causes an employee to be unfit for duty and such misuse was knowing or intentional.

## Drug or Alcohol Infractions Not Directly Covered by This Policy

This policy is not intended to address all circumstances where involvement with drugs or alcohol warrants disciplinary action. Accordingly, nothing in this policy shall be considered as limiting the Company's right to take administrative action or disciplinary action for involvement with drugs or alcohol not specifically addressed in this policy.

## DEFINITIONS

## Drug or Drugs

For purposes of this policy, the words 'drug' or 'drugs' include, but are not limited to: amphetamines, barbiturates, and other hypnotics, cocaine, narcotics (opiates such as heroin, morphine, codeine and methadone), phencyclidine (PCP), hallucinogens, marijuana, or other substances that alter one's senses or could affect one's ability to function on the job, including medicines for which the employee does not have a proper prescription where one is required by law.

### On Duty

For purposes of this policy, the term 'on duty' means when an employee is on Company property or time. Employees are reminded that if use of drugs or alcohol while not on duty results in a prohibited concentration of such substances being present while on duty, the employee will be subject to disciplinary action as set forth in this policy.

### On Company Property

For purposes of this policy, the term 'on Company property' shall include, but not be limited to: land owned or leased by the Company, work sites in the field, and Company vehicles or equipment, including vans used for commuting to and from work.

### Corroborating Evidence that an Employee Was Unfit for Duty

For purposes of this policy, the term 'corroborating evidence that an employee was unfit for duty' shall include, but not be limited to: observation of an employee acting or appearing in a manner which suggests drug or alcohol use, such as by slurred speech, glassy eyes, unsteady walk, significant or repeated lapses of concentration, emotional outbursts, substantial mood changes, etc.

### Marijuana in System

For purposes of this policy, employees will be found to have marijuana in their system if metabolites of the principal active component of marijuana, delta-9-tetrahydrocannabinol (THC), are detected in their urine or if delta-9-tetrahydrocannabinol itself is detected in their blood.

### Regular Employees During Their First Year of Employment

Notwithstanding any other provision of this policy, employees with less than one (1) full year of continuous service shall be discharged on the first occurrence for failing to act in accordance with the rules and standards set forth in this policy. Employees are reminded that it is a term and condition of their employment that the employee is subject to periodic, unannounced testing during that first year of employment.

## ENSURING COMPLIANCE WITH POLICY

Employees are advised that the Company will take action, consistent with this policy, to detect and deter violations of the rules and standards set forth in this policy. Such actions may include, but are not limited to: conducting searches for drugs or alcohol or Company property (with or without assistance), conducting undercover operations, closely scrutinizing whether employees are fit for duty, and testing employees for drugs or alcohol. We regret having to take such measures but feel they are necessary if we are to achieve our goal: a safe workplace and a healthy and efficient workforce free from the effects of substance abuse.

---

**Employee Benefits Information**
All (Exempt) | Recent Changes (Exempt) | All (Non-Exempt) | Recent Changes (Non-Exempt)

HR Home Page

**EXHIBIT C**

# AGREEMENT

This Agreement is between the Potomac Electric Company (hereinafter, "Company"), the International Brotherhood of Electrical Workers (hereinafter, "Union"), Local 1900 and provides as follows:

1.  Effective January 1, 1995, the Company has incorporated the breathalyzer as part of the testing process for the following tests:

    - Any and All CMV Required Tests as mandated by Department of Transportation (DOT);

    - When there is a triggering event or a reason to believe drugs or alcohol may have been used;

    - When an employee is subject to periodic, unannounced testing in the following circumstances:

        a.  During his/her first year of continuous service with the Company;

        b.  When such testing is required under local or federal legislation, regulation or administrative rule;

        c.  During the first two years following any infractions of the drug and alcohol policy that causes an employee to be placed on Decision-Making Leave.

    - At any other time required under local or federal legislation, regulation or administrative rules.

2.  With the incorporation of the breathalyzer in the above tests the Company and the Union agree to the following for purposes of applying PEPCO's drug and alcohol policy, which will be used for any and all tests when extrapolation is warranted:

    a.  The human body metabolizes "burns off" alcohol at a rate of 0.01 to 0.03g/dL per hour. The Company will use 0.015g/dL per hour for all extrapolations when deemed necessary. When the test is performed one (1) hour or less after an employee has reported to work an extrapolation will not be done.



RECEIV

DEC 16 1

Extrapolation Agreement
December 6, 1996
Page 2


_____                    12-11-96
For the Company                                    _____
                                                        Date


_____                    12-11-96
For the Union                                      _____
                                                        Date